```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF INDIANA
 2                           INDIANAPOLIS DIVISION

 3

 4   UNITED STATES OF AMERICA,         )
                                       )
 5                Plaintiff,           )
                                       ) Cause No.
 6        v.                           ) 1:22-cr-00124-MPB-MJD
                                       ) Indianapolis, Indiana
 7   ARNOLD CASTILLO,                  ) August 23, 2023
                                       )
 8                Defendant.           ) 1:03 p.m.

 9

10           BEFORE THE HONORABLE MATTHEW P. BROOKMAN

11              TRANSCRIPT OF PROCEEDINGS
              CHANGE OF PLEA/SENTENCING HEARING
12

13   APPEARANCES:

14   For the Plaintiff:         Tiffany J. Preston, AUSA
                                UNITED STATES ATTORNEY'S OFFICE
15                              10 West Market Street, Suite 2100
                                Indianapolis, IN  46204
16

17
     For the Defendant:         Gwendolyn M. Beitz
18                              INDIANA FEDERAL COMMUNITY
                                DEFENDERS, INC.
19                              111 Monument Circle, Suite 3200
                                Indianapolis, IN  46204
20

21
     Court Reporter:            Amy L. Hooten, RMR, CRR
22                              United States District Court
                                101 N.W. MLK, Jr. Blvd.
23                              Evansville, IN  47708
                                (812) 202-5603
24
                     PROCEEDINGS TAKEN BY MACHINE SHORTHAND
25         TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

1        *(In open court.)*

2            THE COURT:  Good afternoon, everyone.  Today's date

3    is August 23rd, 2023.  We're here in the United States

4    District Court for the Southern District of Indiana in the

5    Indianapolis Division, calling the matter of the United States

6    of America versus Arnold Castillo.  This is Cause No.

7    1:22-cr-124.

8            Present in the courtroom is the defendant,

9    Mr. Castillo.  Seated with him is his attorney, Attorney Gwen

10   Beitz.  Ms. Beitz, Mr. Castillo, good afternoon.

11           MS. BEITZ:  Good afternoon, Your Honor.

12           THE COURT:  Government is represented today by

13   Assistant United States Attorney Tiffany Preston.  Good

14   afternoon, Ms. Preston.

15           MS. PRESTON:  Good afternoon, Your Honor.

16           THE COURT:  And, Ms. Preston, who do you have with

17   you at your counsel table?

18           MS. PRESTON:  FBI Special Agent Len Rothermich, Your

19   Honor.

20           THE COURT:  Got you.  Very good.  Good afternoon to

21   you all, too.

22           MS. PRESTON:  Thank you.

23           THE COURT:  And Probation Officer Danieka Thompkins

24   is here.  Good afternoon.  Court staff, marshal staff, and we

25   have some folks in the gallery as well.

1        In fact, why don't we start with that.  Ms. Preston,

2   I note that there was a victim impact statement that was filed

3   yesterday or earlier today even.  Do you have -- are there

4   victims here today in the courtroom?

5        MS. PRESTON:  Yes, Your Honor.  Minor Victim 1, who

6   still remains a minor, her mother is present, and her sister

7   is present, who would like to address the Court at the time of

8   sentencing.  And you will see, Your Honor, behind me that

9   Minor Victim 1's mother speaks predominantly Spanish.  And so

10  we have an interpreter here to assist her, should she need it

11  during the hearing.

12       THE COURT:  Okay.  And you are not requesting the

13  interpreter be sworn or anything?

14       MS. PRESTON:  No, Your Honor.  He is simply here to

15  assist Minor Victim 1's mother, and she does not intend to

16  speak on the record, and so we don't need for him to be sworn.

17       THE COURT:  All right.  And Minor Victim 1's sister,

18  what is her name?

19       MS. PRESTON:  I will allow her to introduce herself

20  and so she can spell it on the record.  If you would stand for

21  the judge.

22       VICTIM'S SISTER:  My name is █████.

23       MS. PRESTON:  And she -- I have advised her to not

24  use her last name on the record so as to protect the identity

25  of Minor Victim 1.

1          THE COURT:  All right.  Very good.  If we could, I

2     would ask the Government maybe to supplement today with a

3     sealed entry giving us the names on that.  So all right.  Very

4     good.

5          MS. PRESTON:  Yes, Your Honor.

6          THE COURT:  Ms. Beitz, is the defendant ready to

7     proceed with the change of plea and sentencing hearing today?

8          MS. BEITZ:  Yes, Your Honor.

9          THE COURT:  Ms. Preston, is the Government ready to

10     proceed?

11          MS. PRESTON:  Yes, Your Honor.

12          THE COURT:  And we are here, in fact, for a change of

13     plea and sentencing hearing.

14          Mr. Castillo, if you could stand please, and I'm

15     going to swear you in.

16     *(Defendant sworn.)*

17          THE DEFENDANT:  Yes.

18          THE COURT:  Ms. Beitz, is it more convenient to stay

19     at the table, or do you all wish to take the lectern?  I know

20     you have some stuff that you're working with there.

21          MS. BEITZ:  Thank you.  I would like to have my

22     papers.

23          THE COURT:  That's fine.  I understand that, so

24     that's fine.  So we'll proceed from counsel table.  You all

25     may be seated.

1           MS. BEITZ:  If we do need to -- there wasn't a lapel

2    mic, but I speak loudly, so we'll be okay.

3           THE COURT:  Yeah, I think Amy is covering it so far.

4    So you all may be seated.

5           Mr. Castillo, you understand that you are under oath

6    now?

7           THE DEFENDANT:  Yes.

8           THE COURT:  All right.  And how old are you today,

9    sir?

10          THE DEFENDANT:  Huh?

11          THE COURT:  How old are you today?

12          THE DEFENDANT:  Twenty-three, Your Honor.

13          THE COURT:  And you are an English speaker, you can

14   speak English just fine?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  All right.  And you understand that under

17   oath means that you are sworn to tell the truth, that if you

18   were not to tell the truth, that there could be consequences

19   associated with that, not the least of which could be

20   additional criminal charges brought.  Do you understand that?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  All right.  The charges in this matter

23   come by way of a document that's called an indictment.  I'm

24   holding a copy of that up now.

25          Have you received a copy of the indictment?

```
 1                THE DEFENDANT:  Yes, Your Honor.

 2                THE COURT:  And you've had a chance to review that

 3     with your attorney, Ms. Beitz?

 4                THE DEFENDANT:  Yes.

 5                THE COURT:  All right.  In general, Mr. Castillo, are

 6     you satisfied with the representation that's been provided to

 7     you by Ms. Beitz as your attorney?

 8                THE DEFENDANT:  Yes, Your Honor.

 9                THE COURT:  No complaints at this time?

10                THE DEFENDANT:  No, Your Honor.

11                THE COURT:  All right.  The Court has before it a

12     petition to enter a plea of guilty and a plea agreement, one

13     document.  That was filed at Docket 40- -- what is that?

14                MS. PRESTON:  47, Your Honor.

15                THE COURT:  47.  It's cut off on my copy.

16                Do you have that document in front of you,

17     Mr. Castillo?

18                THE DEFENDANT:  Yes, Your Honor.

19                THE COURT:  You will see on the back page there's a

20     signature, your signature as well as Ms. Beitz's signature, on

21     page 27.  I'm holding that up now.  Do you see that?

22                THE DEFENDANT:  Yes, Your Honor.

23                THE COURT:  Is that your signature on the plea

24     agreement?

25                THE DEFENDANT:  Yes, Your Honor.
```

1          THE COURT:  That signature tells me that you have

2   read this agreement, that you understand it, and that you

3   intend to enter into this agreement that's memorialized in the

4   plea agreement.

5          Is all of that accurate?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  There is a -- at the beginning on page 23

8   of the plea agreement, if you follow along, there is a

9   statement, a section listed that's a statement from you, the

10  defendant.  It says that you have received a copy of the

11  indictment, that you have read it and discussed it with your

12  attorney, that you understand the accusations made against you

13  in the case, and that you wish the Court to admit and consider

14  as waived all readings of the indictment in open court, and

15  all further proceedings, including arraignment.  Is that

16  accurate?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  It also says that you have told your

19  attorney the facts and surrounding circumstances as known to

20  you concerning the matters mentioned in the indictment and you

21  believe that your attorney is fully informed as to all such

22  matters.  Is that accurate?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  It indicates that you've received counsel

25  from your lawyer as to the nature and cause of every

1    accusation against you and to any possible defenses that you

2    might have.  Is that accurate?

3             THE DEFENDANT:  Yes, Your Honor.

4             THE COURT:  All right.  It says that you have read

5    the entire plea agreement, and you've discussed it with your

6    attorney.  And you've indicated to me earlier that you have

7    done that.  Is that true?

8             THE DEFENDANT:  Yes, Your Honor.

9             THE COURT:  And that you understood the terms of the

10   plea agreement and that those terms correctly reflect the

11   status of the plea negotiations between you and the

12   Government.  Is that accurate?

13            THE DEFENDANT:  Yes, Your Honor.

14            THE COURT:  All right.  It says that no other offers

15   have been made to you other than this plea agreement, so

16   there's no side deals or any other documents out there that

17   you or the Court is aware of.  Is that accurate?

18            THE DEFENDANT:  Yes.

19            THE COURT:  All right.  It says that you're fully

20   satisfied with your attorney's representation during all

21   phases of the case, that she's done everything that anyone

22   could do as counsel to assist you, and that you fully

23   understand the proceedings as a result of the counsel that she

24   has provided to you.  Is that accurate?

25            THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  All right.  It indicates that you're

2     making no claim of innocence and that you wish to freely and

3     voluntarily plead guilty of your own will.  Is that right?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  And that you ultimately intend to plead

6     guilty because you are, in fact, guilty of the offense.  Is

7     that correct?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  It indicates, Mr. Castillo, that your

10     lawyer, that Ms. Beitz, has talked to you about your rights to

11     an appeal of any conviction and sentence and that you -- that

12     is, unless you waive those rights, and that if you waive those

13     rights, that you may waive those rights in the plea agreement,

14     but that you understand that you would have those rights, but

15     that you can also waive those.  Is that correct?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  And you understand that any trial dates

18     or any further hearing dates in this matter would be -- would

19     be vacated as a result of the hearing today?  You understand

20     that?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  All right.  Ms. Beitz, there's a section

23     on the plea agreement also, the certificate of defense

24     counsel, and it lists a number of representations by you.

25          Are all of those representations accurate, and you've

1    discussed all of those with Mr. Castillo?

2         MS. BEITZ:  I have, Your Honor.  And in addition to

3    this, I would state for the record that Ms. Preston and I did

4    sit down and look at all of the evidence in this case.  I was

5    given full access to all of the documents, as well as all of

6    the forensic evidence with regard to any computers that were

7    taken, and also any of the search warrant returns, I was given

8    access to all of that prior to advising Mr. Castillo to sign

9    this plea agreement.

10        THE COURT:  Okay.  Very good.

11        Mr. Castillo, I want to go through the petition and

12   plea agreement with you at this time.  You have it in front of

13   you, correct?

14        THE DEFENDANT:  Yes, sir.

15        THE COURT:  All right.  Let's talk about it.

16   Paragraph 1 indicates that you are petitioning the Court to

17   enter a plea of guilty to Count 1 and Count 2 of the

18   indictment.  Count 1 charges you with the offense of

19   transportation of a minor with the intent to engage in

20   criminal sexual activity in violation of Title 18, United

21   States Code, Section 2423(a) and (e) and Section 2, and then

22   Count 2 charges the offense of coercion and enticement of a

23   minor and attempt in violation of Title 18, United States

24   Code, Section 2422(b).

25        Are those the offenses that you have been indicted of

1    and that you wish to plead guilty to today?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Those crimes have potential statutory

4    ranges of punishment.  As to Count 1, it's punishable by a

5    maximum sentence of life in prison, a $250,000 fine, and a

6    period of up to a lifetime of supervised release following any

7    term of imprisonment.  Count 1 has a mandatory minimum

8    sentence of ten years imprisonment.

9          Count 2 is also punishable by a maximum sentence of

10   life imprisonment, a $250,000 fine, and a period of up to a

11   lifetime of supervised release.  And Count 2 also has a

12   mandatory minimum sentence of ten years imprisonment.

13         Do you understand those statutory ranges of

14   punishment?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  All right.  Each of the crimes charged

17   has certain elements that would have to be proven by the

18   Government if this matter were to go to trial.

19         As to Count 1, the elements would be that the

20   defendant knowingly transported Minor Victim 1 in interstate

21   commerce; 2, that Minor Victim 1 was less than 18 years of age

22   at the time; and, 3, that the defendant intended that Minor

23   Victim 1 engage in sexual activity which, if it had occurred,

24   the defendant would have committed the criminal offense of

25   sexual misconduct with a minor or, the New Jersey law,

1    prohibiting aggravated sexual assault of a minor under the age

2    of 16.

3              Do you understand those to be the elements that the

4    Government would have to prove as to Count 1?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  As to Count 2, the elements would be, 1,

7    that the defendant used a facility or means of interstate

8    commerce to knowingly persuade, induce, entice, coerce Minor

9    Victim 1 to engage in sexual activity; and, 2, that the Minor

10   Victim 1 was less than 18 years of age; and, 3, that the

11   defendant, you, believed Minor Victim 1 was less than 18 years

12   of age; and, 4, that if the sexual activity had occurred, the

13   defendant would have committed the criminal offense of

14   prohibiting sexual misconduct with a minor or, in New Jersey

15   law, prohibiting aggravated sexual assault of a minor under

16   the age of 16.

17             Do you understand those to be the elements of

18   Count 2?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  The plea agreement indicates that you

21   agree and understand that the Court will use its discretion to

22   fashion a sentence within the statutory range that we just

23   discussed earlier, that the Court will consider the factors

24   set forth in Title 18, United States Code, Section 3553(a) in

25   determining the appropriate sentence within the statutory

1    range, and that the Court will also consult and take into

2    account the United States Sentencing Guidelines in determining

3    the appropriate sentence within the statutory range.

4          Do you understand all of that?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Have you talked about the sentencing

7    guidelines and how they might apply in your case with

8    Ms. Beitz?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  Do you feel you understand those?  Do you

11   have any questions about those at this time?

12         THE DEFENDANT:  I have no further questions, Your

13   Honor.

14         THE COURT:  Okay.  You understand, Mr. Castillo, that

15   the sentencing guidelines are not mandatory or binding on the

16   Court but they're merely advisory in nature?  Do you

17   understand that?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  And that an amount of restitution may be

20   imposed.  Do you understand that?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Do you understand that by pleading guilty

23   to more than one offense, being Count 1 and Count 2, that the

24   Court may order the sentences of each Count 1 and Count 2 to

25   be served concurrently or consecutively, but that would be a

1    decision up to the Court.  Do you understand that?

2         THE DEFENDANT:  Yes, Your Honor.

3         THE COURT:  And also any determination of ultimate

4    determination of the guideline range, your criminal history

5    category, those would all be determinations that would be made

6    by the Court.  Do you understand that?

7         THE DEFENDANT:  Yes, Your Honor.

8         THE COURT:  You understand that by pleading guilty

9    that the Court could impose the same sentence as if you had

10   pled not guilty, had gone to trial in this matter, and been

11   found guilty by a jury?

12        THE DEFENDANT:  Yes, Your Honor.

13        THE COURT:  Mr. Castillo, the plea agreement

14   indicates that it is being made pursuant to Federal Rule of

15   Criminal Procedure 11(c)(1)(B).  And under that rule, the

16   determination of the defendant's sentence is within the

17   discretion of the Court.  In other words, that the parties

18   have not come to an agreement or made a binding agreement or

19   recommendation to the Court.  Do you understand that?

20        THE DEFENDANT:  Yes, Your Honor.

21        THE COURT:  You understand that if the Court decides

22   to impose a sentence higher or lower than any recommendation

23   of either party or determines a different advisory sentencing

24   guideline range applies or decides to impose a sentence

25   outside of any applicable sentencing guideline range for any

1    reason, that you would not be permitted to withdraw your

2    guilty plea if that happened and for the reason that it would

3    -- and would be bound by that guilty plea?  Do you understand

4    that?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  All right.  You understand, Mr. Castillo,

7    that the Government -- that you, rather, would have the right

8    to plead not guilty to or, if you've already entered a plea of

9    not guilty, to continue in that plea of not guilty, to have a

10   jury trial, to be represented by counsel at the trial, and if

11   necessary to have appointed counsel, to confront and

12   cross-examine adverse witnesses called against you in the

13   trial, to be protected from compelled self-incrimination, to

14   testify, if you chose to, and present a defense and to compel

15   the attendance of witnesses.  Do you understand you would have

16   all of those rights if you persisted in your not guilty plea?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  You understand that by pleading guilty,

19   you will be giving up those rights, we won't have a trial, and

20   you will be adjudged guilty?  Do you understand that?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  The plea agreement contains certain

23   sentencing recommendations that the parties have entered into.

24   Those begin on page 5.  It starts out by indicating that the

25   parties have not agreed to a specific sentence to recommend to

1   the Court.  Is that your understanding as well?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Your counsel and you will make one

4   recommendation to me, the Government may make a different

5   recommendation, and ultimately the Court will have to decide

6   what sentence to impose if your plea is accepted.  Do you

7   understand that?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  The Government has agreed to recommend a

10  sentence within the applicable sentencing guideline range as

11  calculated by the Court and at the time of sentencing.

12         You understand you have -- you are free to recommend

13  any sentence within the statutory range, but you understand --

14  and you understand that the Court may not impose a sentence

15  that's below the mandatory minimum sentence of ten years

16  imprisonment?  Do you understand that?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  The plea agreement indicates that you

19  will be requesting the Court recommend a Bureau of Prisons

20  placement to serve any sentence imposed in an institution that

21  you will -- that your lawyer will tell the Court about.  You

22  understand that I may make that recommendation, but that's

23  only a recommendation, that I can't control where the Bureau

24  of Prisons actually places you?  Ultimately, that decision is

25  up to the Bureau of Prisons.  Do you understand that?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And the Government's indicated that they

3    would not object to the requested recommendation.

4          Mr. Castillo, the plea agreement indicates that both

5    parties have reserved the right to present evidence and

6    argument concerning whether I impose a term of supervised

7    release and, if I do, what the length of that supervised

8    release is and what the conditions of that supervised release

9    would be.  You understand that?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  You understand there will be a mandatory

12   special assessment of $200 if your plea is accepted in your

13   sentence?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Under the terms of the plea agreement,

16   the Government has agreed that it will not ask the Court to

17   impose a fine.  However, the parties -- it indicates that the

18   parties understand and agree that federal law requires a

19   restitution payment to the victim and that the defendant

20   agrees to pay Minor Victim 1, as identified in the stipulated

21   factual basis, $10,000 for the harm proximately caused to

22   Minor Victim 1 as a result of these criminal offenses.  Is

23   that your agreement as well?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Mr. Castillo, before the Court can accept

1    any guilty plea, I have to be satisfied that there is a

2    factual basis for the guilty plea.  In other words, that if

3    the matter had gone to trial, that the Government would be

4    able to present facts to a jury that would allow that jury to

5    find you guilty.  The plea agreement contains a factual basis

6    for a guilty plea.  It begins on page 11.

7          I'm going to ask the Government to read that factual

8    basis at this time.  I want you to listen carefully.  When

9    it's over, when the Government is done reading, I'm going to

10   ask you if you've heard that, if you understood it, and if you

11   agree that those facts would provide a factual basis for

12   purposes of your guilty plea, okay?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  All right.

15         Ms. Preston, if you would present the factual basis.

16         MS. PRESTON:  Yes, Your Honor.

17         As set forth beginning on page 11 of the plea

18   agreement, if this matter had proceeded to trial, the United

19   States would have shown the following facts which would have

20   proven the defendant guilty beyond a reasonable doubt as to

21   the counts in the indictment:

22         We would have shown that Arnold Castillo was a

23   resident of Paterson, New Jersey.  Minor Victim 1 was a

24   resident of Marion County, which is in the Southern District

25   of Indiana.  Minor Victim 1 was born in 2006.  Castillo knew

1    that Minor Victim 1 was 15 years old at the time he committed

2    the offenses of conviction.  He further knew that Minor Victim

3    1 was a vulnerable victim and used the information he knew

4    about her mental state to facilitate the commission of this

5    offense.

6         Beginning in at least January 2022, and continuing

7    until on or about May 11th, 2022, Castillo communicated with

8    Minor Victim 1 via social media and gaming applications such

9    as Instagram, Roblox, and Discord.  Instagram, Roblox, and

10   Discord are facilities of interstate commerce.

11        During their conversations, Castillo engaged in

12   grooming behaviors, such as buying Minor Victim 1's anime that

13   she had posted online using CashApp, and buying other items on

14   Amazon which he delivered to her in Indiana.  CashApp and

15   Amazon are facilities of interstate commerce.

16        Castillo also knowingly misrepresented his identity

17   to facilitate the commission of the offenses in that he used a

18   false name in his online conversations with Minor Victim 1 and

19   her mother to persuade, induce, entice, coerce, or facilitate

20   the travel of, a minor to engage in prohibited sexual conduct.

21        More specifically, Castillo claimed that his name was

22   Jacob Shedletsky and Jadon Shedletsky and intentionally led

23   Minor Victim 1 and others online to believe that he had the

24   ability to connect them to employment opportunities in the

25   online gaming industry.

1    Castillo also used Instagram and Discord -- sorry --
2    Instagram and Discord to engage in sexually explicit
3    conversations with Minor Victim 1.  For example, between on or
4    about February 10, 2022, and February 18th, '22, Castillo
5    discussed showering with Minor Victim 1 and said that he
6    wanted to make love to Minor Victim 1 and have kids with her.
7    On or about March 14, 2022, Minor Victim 1 asked
8    Castillo what it would sound like when they had sex, and
9    Castillo said he grunts and that she would find out soon.
10   Later in March, Castillo then discussed fingering Minor Victim
11   1's vagina and wanting to explore her body.  Castillo also
12   discussed oral sex and referred to Minor Victim 1's vagina as
13   his "kitty."
14   On or about March 24, 2022, Minor Victim 1 told
15   Castillo that she did not know how to have sex, and Castillo
16   responded that it was "instinctual."  Castillo told Minor
17   Victim 1 that they could experiment if she wanted to, but that
18   he would lead since he had the experience.
19   Between April 7th, 2022, and April 12th, 2022,
20   Castillo purchased and attempted to have Amazon deliver a
21   Huion Artist Glove for a drawing tablet, a Max Smart Tablet
22   Drawing Stand, and a Wacom Mobile Studio Pro 13 Windows 10
23   computer to Minor Victim 1 at her residence.
24   On or about April 13, 2022, Castillo told Minor
25   Victim 1 that "sex is a beautiful thing."  On April 17, 2022,

1    the two discussed having sex.  During this conversation,

2    Castillo discussed Minor Victim 1's hymen, stating, "Now I

3    just need to make you a woman in the bedroom."

4         On or about April 25, 2022, Minor Victim 1 stated

5    that she wanted to run away from home.  Castillo replied, "I

6    did all the setup already," and, "I want to see you really

7    badly, the only way this is going to work is if you listen to

8    me."  He added, "You want to get away from that shit hole

9    right?"

10        On or about April 27th, 2022, Minor Victim 1 told

11   Castillo that she might be too young for intimacy with

12   Castillo.  Castillo responded, "You're not," and added that

13   they could "take as long as [Minor Victim 1] needs."  Castillo

14   told Minor Victim 1, "I want to come for you," and Minor

15   Victim 1 asked Castillo to "deflower" her.  Castillo

16   responded, "I will sweetheart."

17        During these conversations, Castillo and Minor Victim

18   1 discussed their plans for Castillo to arrange for Minor

19   Victim 1 to travel from Indiana to Castillo in New Jersey so

20   they could be together and engage in sexual activity.

21        On or about May 2nd, 2022, Castillo told Minor Victim

22   1 that he looked forward to seeing her "tomorrow" and asked if

23   she had "cleaned [her vagina] well."  Castillo told Minor

24   Victim 1 that he intended to "[mess] with" her vagina, and

25   turn it "into an open rose bud just waiting for [him] to

1    deflower it."

2         Sometime between April and May 2022, Castillo used

3    the Uber application to contact drivers in an attempt to hire

4    a driver to transport Minor Victim 1 from Indiana to New

5    Jersey.  Castillo located a willing driver and communicated

6    with the driver first on the Uber application and then off the

7    platform via direct message.  Castillo arranged to pay the

8    driver to pick up Minor Victim 1 from her residence in Marion

9    County, Indiana and drive her to Paterson, New Jersey.

10        On or about May 2nd, 2022, Minor Victim 1 posted on

11   her Instagram page, "Goodbye Indiana."  Between on or about

12   May 3rd, 2022, and May 4th, 2022, the driver transported Minor

13   Victim 1 from her home in Indiana to Castillo in Paterson, New

14   Jersey.  Castillo then paid the driver for transporting Minor

15   Victim 1.

16        Accordingly, we would show that between on or about

17   May 3rd, 2022, and May 4th, 2022, Castillo knowingly had Minor

18   Victim 1 transported from Indiana to New Jersey for the

19   purpose of engaging in any sexual activity for which any

20   person can be charged with a criminal offense, specifically,

21   sexual misconduct with a minor under Indiana law and

22   aggravated sexual assault of a minor under the age of 16 under

23   New Jersey law.

24        We would have further shown that Castillo knew that

25   Minor Victim 1's parent was unaware that he was transporting

1   Minor Victim 1 and would not have consented to same.  Castillo
2   further, we would have shown, used a facility of interstate
3   commerce, namely, Instagram, Discord, text messaging, Uber,
4   and CashApp to facilitate her transportation across state
5   lines for the purpose of engaging in criminal sexual activity.
6          Upon Minor Victim 1's arrival to Castillo's residence
7   in Paterson, New Jersey, Castillo did engage in sexual
8   intercourse, including vaginal and oral sex with Minor Victim
9   1.  He used the Uber application to have others purchase or
10  attempt to purchase the Plan B pill for Minor Victim 1 to
11  prevent her from becoming pregnant.
12         He kept Minor Victim 1 under his care, custody, and
13  control in a small room located adjacent to his residence and
14  controlled her movements in and out of the room.  He also
15  controlled her access to food and basic necessities and knew
16  that she had no financial resources or ability to travel back
17  to Indiana.
18         Accordingly, Mr. Castillo used a facility or means of
19  interstate or foreign commerce to knowingly persuade, induce,
20  entice, and coerce and attempt to knowingly persuade, induce,
21  entice, and coerce Minor Victim 1, an individual who had not
22  attained the age of under [sic] 18, to engage in sexual
23  activity, for which any person can be charged with a criminal
24  offense, including but not limited to vaginal intercourse with
25  a child who was 15 years old.

1      Additionally, we would have shown that Castillo

2   knowingly obstructed justice when he lied to law enforcement

3   about Minor Victim 1's whereabouts.  Namely, on or about

4   May 5th, 2022, and while Minor Victim 1 was living with

5   Castillo in New Jersey, Castillo, using an alias, spoke to law

6   enforcement officers over the phone who were searching for

7   Minor Victim 1.

8      During that conversation, Castillo falsely stated to

9   law enforcement officers that he was from California.  When

10  asked about Minor Victim 1's whereabouts, Castillo

11  intentionally lied to law enforcement and stated that she must

12  have run away due to issues with her family or from "other

13  people bothering her."

14     Castillo also falsely told law enforcement that he

15  suspected that Minor Victim 1 "may have run away on a whim"

16  due to her "emotional outbursts."  He acknowledged sending

17  Minor Victim 1 items through the mail using Amazon and even

18  forwarded detectives copies of those transactions.  But when

19  asked why his billing address was in New Jersey, Castillo

20  falsely responded that the person who conducts his

21  transactions for him was an associate who lived there.

22     Castillo intentionally obstructed justice and failed

23  to disclose to officers that Minor Victim 1 had not run away,

24  but, in fact, that Castillo had transported Minor Victim 1 to

25  New Jersey and that she was in his care, custody, and control

1    so that he could engage in criminal sexual acts with her.

2          On or about May 11th, 2022, at least eight days after

3    Minor Victim 1 was reported missing by her mother, and seven

4    days after she arrived in New Jersey, federal agents recovered

5    Minor Victim 1 from Castillo as they were walking in front of

6    his residence in Paterson, New Jersey.  He possessed several

7    unopened condoms in his pocket.

8          Castillo, having been read and advised of his rights

9    and acknowledged them -- acknowledging them orally and in

10   writing in an audio- and video-recorded interview, confessed

11   that he was -- that he used private messenger applications to

12   chat with Minor Victim 1 about conducting sexual acts

13   together, knowing that she was 15 years old.

14         He also admitted to using online applications to plan

15   their shared intention for her to travel from Indiana to New

16   Jersey in order to be with him romantically.  He admitted to

17   using CashApp to pay an Uber driver to pick up Minor Victim 1

18   from Indianapolis and bring her to Paterson, New Jersey on or

19   about May 3rd, 2022.

20         He explained that he found a driver willing to make

21   this trip and paid the driver $500 prior to his departure from

22   New Jersey.  Upon the driver's arrival with Minor Victim 1 in

23   the early morning hours of May 4th, 2022, Mr. Castillo paid

24   the driver an additional $500 in cash for the ride.

25         Following this, Castillo admitted in his interview to

1    having vaginal intercourse with Minor Victim 1 four times over

2    the course of the week that followed.  He used false

3    identities to communicate with Minor Victim 1 and law

4    enforcement, such as Jacob Shedletsky and Jadon Shedletsky.

5    He knew that Minor Victim 1 was unusually vulnerable because

6    she told Castillo things that made that clear.

7          Accordingly, between on or about January '22, and on

8    or about May 11th, 2022, within the Southern District of

9    Indiana and elsewhere, the defendant, Arnold Castillo,

10   knowingly had Minor Victim 1, an individual who had not

11   attained the age of 18 years, transported in interstate

12   commerce from Indiana to New Jersey, with the intent that she

13   engage in sexual activity for which any person can be charged

14   with a criminal offense and aided and abetted others in doing

15   so.

16         Additionally, between January 2022, and on or about

17   May 11, 2022, within the Southern District of Indiana and

18   elsewhere, Mr. Castillo used a facility or means of interstate

19   or foreign commerce to knowingly persuade, induce, entice, and

20   coerce, and attempt to do the same, Minor Victim 1, an

21   individual who had not attained the age of 18 years, to engage

22   in sexual activity for which any person can be charged with a

23   criminal offense, specifically, sexual misconduct with a minor

24   under Indiana law, and aggravated sexual assault of a minor

25   under the age of 16 under New Jersey law.

1          Thank you, Your Honor.

2          THE COURT:  All right.  Mr. Castillo, were you able

3    to hear the Government's factual basis statement?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Do you agree that the Government could

6    prove those things if this matter had gone to trial and that

7    those facts would establish a basis for a guilty finding if it

8    had gone to trial?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  All right.  Mr. Castillo, on page 18 of

11    the plea agreement, there are certain guidelines stipulations

12    that the parties have entered into.  I want to go through

13    those with you now.

14          You understand, again, that the Court will ultimately

15    determine what the guidelines range is in this matter and what

16    guidelines apply, but the parties can and have entered into

17    certain stipulations about the guidelines.

18          Starting with -- it indicates that the base offense

19    level for Count 1 is a Level 28 pursuant to Guidelines Section

20    2G1.3(a)(3), that that base offense level would be increased

21    by two because the minor was otherwise in the custody, care,

22    or supervisory control of the defendant, although the

23    presentence report indicates that the presentence report

24    writer did not believe that increase would be appropriate, but

25    the parties have stipulated to that.

1          And then it finds that the base offense level is

2     increased -- also increased by two because the offense

3     involved the knowing misrepresentation of a participant's

4     identity to persuade, induce, entice, coerce, or facilitate

5     the travel of a minor to engage in prohibited sexual conduct.

6          Also, that the base offense level would be increased

7     by two because the offense involved the use of a computer or

8     an interactive computer service to persuade, induce, entice,

9     coerce, or facilitate the travel of the minor.  It's also

10    increased by two levels because the offense involved the

11    commission of a sex act or a sexual conduct, and then

12    increased by two levels because the defendant knew or should

13    have known that the victim of the offense was a vulnerable

14    victim, resulting in a Total Offense Level 38 as to Count 1.

15         Is that your stipulation, Mr. Castillo?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  And then as to Count 2, the base offense

18    level stipulated to is a Level 28.  Again, a two-level

19    increase because the minor was in custody, care, or

20    supervisory control of the defendant.  And I understand that

21    there is a -- there will be a dispute about that, but that's

22    the stipulation here.

23         Increased by two levels because the offense involved

24    knowing misrepresentation, as I mentioned earlier.  Increased

25    by two levels for the use of a computer.  Increased by two

1    levels because the offense involved the commission of a sex

2    act or sexual contact.  And then increased by two levels

3    because you knew or should have known that the victim of the

4    offense was a, quote, vulnerable victim.  Again, resulting in

5    an Offense Level 38.

6              Is that your stipulation as well?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  The parties have stipulated that because

9    there are multiple counts here, Count 1 and Count 2, that they

10   will be grouped.  The parties have also stipulated that a

11   two-level increase would be appropriate because of obstruction

12   or impeding the administration of justice, resulting in a

13   subtotal offense level of 40.

14             And then, lastly, the parties have stipulated and

15   agreed that you would be eligible for three levels of

16   reduction in the offense level because you have accepted your

17   responsibility for your conduct in this action.  That would

18   result in a final offense level of 37.

19             Is that your stipulation, Mr. Castillo?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  All right.  Ms. Preston, do you wish to

22   be heard or make any record about the sex offender

23   registration or the civil commitment possibilities?

24             MS. PRESTON:  Yes, Your Honor.  Thank you.

25             THE COURT:  Okay.

1          MS. PRESTON:  Your Honor, in open court, the United

2    States would like the defendant to acknowledge that he has

3    been advised and understands that pursuant to Title 18, United

4    States Code, Section 4248, he faces potential civil commitment

5    as a sexually dangerous person following the expiration of his

6    term of imprisonment, that he understands that any potential

7    civil commitment would be subject of a separate civil

8    proceeding, and that he further understands that no one,

9    including his attorney or the Court, can predict with

10   certainty the effect of his conviction on such a civil

11   commitment determination or the likelihood that civil

12   commitment would be imposed.

13         We would also like him to acknowledge that he

14   understands that civil commitment can be imposed for an

15   indefinite period of time; and yet, he, nevertheless, affirms

16   that he wants to plead guilty regardless of any potential

17   civil commitment consequences that his plea may entail.

18         Your Honor, we further would like the defendant to

19   acknowledge that he has been advised that following his

20   conviction he shall register as a sex offender with the

21   appropriate authorities of any state in which he resides, is

22   employed, or attends school, as required by both federal and

23   state law pursuant to Title 18, United States Code, Section

24   3583(d) and the Sex Offender Registration and Notification

25   Act.

1          THE COURT:  Okay.  Ms. Beitz, have you discussed with

2    Mr. Castillo the potential civil commitment and also the

3    statutory requirements of sex offender registration upon

4    conviction?

5          MS. BEITZ:  Yes as to both, Your Honor.

6          THE COURT:  You have?  And you agree that

7    Ms. Preston's comments are accurate as far as what the statute

8    could impose and what it requires as far as registration?

9          MS. BEITZ:  I agree, Your Honor.

10          THE COURT:  Okay.  Mr. Castillo, you've discussed

11    those things with Ms. Beitz?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  And you understand the potential there

14    and the requirements that may be imposed upon conviction as

15    far as being a registered sex offender?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  Okay.  Mr. Castillo, the last thing I

18    want to discuss with regard to the plea agreement is the

19    appeal waiver section.  That begins on page 21.  I want to

20    make sure that you understand these and that this is what

21    you've agreed to.

22          You understand that you would have a statutory right

23    to appeal any conviction after trial, certainly, but even

24    potentially upon a plea and as to the conviction, as to the

25    sentence imposed as well.  You've indicated that you

1    acknowledge those rights, but that in exchange for concessions

2    that have been made by the Government in this plea agreement,

3    that you agree to waive your right to an appeal of the

4    conviction and the sentence imposed in this case on any

5    ground, including the right to appeal conferred under Title

6    18, United States Code, Section 3742.

7         Is that your agreement, Mr. Castillo?

8         THE DEFENDANT:  Yes, Your Honor.

9         THE COURT:  All right.  It indicates that you further

10   expressly waive any and all challenges to the statute to which

11   the defendant -- to which you're pleading guilty on

12   constitutional grounds, as well as any challenge that that

13   admitted conduct does not fall within the scope of the

14   applicable statute.

15        Is that your agreement as well?

16        THE DEFENDANT:  Yes, Your Honor.

17        THE COURT:  And this waiver would specifically

18   include all provisions of the guilty plea and sentence

19   imposed, including the length and condition of supervised

20   release and the amount of any fine.

21        So you're not -- you have agreed that you won't

22   appeal any issues with regard to supervised release, length,

23   and/or the conditions that are imposed?

24        THE DEFENDANT:  Yes, Your Honor.

25        THE COURT:  All right.  Now, it does -- the appeal

1    waiver does leave open the potential to raise an appeal with

2    regard to any claims of ineffective assistance of counsel.

3    You can't waive that, and the agreement expressly states that

4    you have not waived that.  Is that your understanding as well?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  All right.  Also, it discusses your

7    rights should there be a retroactive sentencing guideline

8    change, also addresses the ability to raise a motion for

9    compassionate release in the future under the First Step Act.

10           And you recognize and know what your rights are with

11    respect to those possibilities in the future as well?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  Yeah.  Mr. Castillo, those are the terms

14    of the -- the essential terms of the plea agreement and the

15    petition.

16           Has anyone in any way attempted to force you to plead

17    guilty here today?

18           THE DEFENDANT:  No, Your Honor.

19           THE COURT:  Are you pleading guilty of your own free

20    will because you are, in fact, guilty of these offenses?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  Has anyone made any other promises to

23    you, other than those promises and agreements that are

24    contained within the plea agreement?

25           THE DEFENDANT:  No, Your Honor.

1          THE COURT:  Do you understand that the offenses to

2    which you are pleading guilty to are felony offenses, that if

3    your pleas are accepted, you would be adjudged guilty of those

4    offenses and that such adjudication may deprive you of

5    valuable civil rights, such as your right to vote, your right

6    to hold public office, your right to serve on a jury, and your

7    right to possess any kind of firearm legally in the future?

8    Do you understand you're giving up those rights?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Knowing all of that, Mr. Castillo, and

11   with everything we've gone through, in light of it, how do you

12   now plead to the charges contained in the indictment, Count 1

13   and Count 2, guilty or not guilty?

14          THE DEFENDANT:  Guilty, Your Honor.

15          THE COURT:  All right.  It's the finding of the Court

16   in this matter that the defendant, Arnold Castillo, is fully

17   competent and capable of entering an informed plea, that the

18   defendant is aware of the nature of the charges and the

19   consequences of the plea, that the plea of guilty is knowing

20   and voluntarily supported by an independent factual basis

21   containing each of the essential elements of each of the

22   offenses in Count 1 and Count 2.  The plea, therefore, to

23   Count 1 and Count 2 is accepted.  The defendant is now

24   adjudged guilty of the offenses as they are charged.

25          Ms. Beitz, is the defendant prepared to proceed to

1    sentencing at this time?

2        MS. BEITZ:  He is, Your Honor.

3        THE COURT:  Ms. Preston, is the Government prepared

4    to proceed to sentencing?

5        MS. PRESTON:  Yes, Your Honor.

6        THE COURT:  The Government -- the Court, rather, has

7    before it several documents that are related to sentencing.

8    They include the presentence investigation, which appears at

9    Docket 52.  There was a sentencing memorandum prepared on

10   behalf of Mr. Castillo, prepared and filed at Docket 54.  The

11   Government's also filed a sentencing memorandum at Docket 58.

12       There has been filed a notice of filing of victim

13   impact statement that has attached to it a victim impact

14   statement filed on behalf of the victim.  That's at Docket 60.

15   Those are the -- those are the documents that the Court has

16   before it for purposes of sentencing.

17       Ms. Beitz, anything else that the Court needs to

18   consider on the record?

19       MS. BEITZ:  Yes, Your Honor.  There was an additional

20   letter filed at Docket 57.

21       THE COURT:  I think I actually had it paper-clipped

22   to the defendant's sentencing memorandum.  Let me just double

23   check.  I did see that, yes.  Yes, I've got that one at Docket

24   57, the letter in support.  I have reviewed that, and I do

25   have that as well.

1            Anything else, Ms. Beitz?

2            MS. BEITZ:  No, Your Honor.

3            THE COURT:  Ms. Preston, anything else you can think

4    of that the Court needs to have or should be available for

5    purposes of sentencing?

6            MS. PRESTON:  No, Your Honor.

7            THE COURT:  All right.  I would note that the

8    presentence report was prepared.  There is -- it deviates from

9    the -- from the guidelines stipulations that were contained in

10   the plea agreement at one specific location.  I would note

11   that there were no objections to the presentence report by the

12   Government.  No objections by the defendant.

13           Is that accurate, Ms. Preston?

14           MS. PRESTON:  Yes, Your Honor.

15           THE COURT:  Is that accurate, Ms. Beitz?

16           MS. BEITZ:  Yes, Your Honor.

17           THE COURT:  Let's discuss the guidelines stipulation.

18   Let me find it here.  Okay, yeah.  The stipulation in question

19   was a two-level increase under 2G1.3(b)(1)(B), which provided

20   for a two-level increase if a minor victim is entrusted to the

21   defendant.

22           And while the parties stipulated to a two-level

23   increase for that, our PSR writer, and I agree, that that

24   would apply typically to someone with custody, like an

25   adoption or, you know, has actually custody over a child,

1   legal custody, not just merely kind of custody in the informal

2   sense of the word.  So the PSR does not include two levels for

3   that.  I believe that's appropriate to not include two levels,

4   a two-level increase for that.

5         Ms. Preston, do you have any objection or do you have

6   any comment on that?

7         MS. PRESTON:  No.  As set forth in my sentencing

8   memorandum, Your Honor, what the probation officer noted, and

9   we agree with that, is that between the committee notes, but

10  also case law, that the word "entrust," entrusted the care,

11  custody, and control over the minor.

12        Here Mr. Castillo did admit.  And as you see in the

13  factual basis, he had care, custody, and control over her, her

14  total movements.  She was at his residence.  She had no

15  ability to come and go, have basic necessities, or food.

16  However, that care was not entrusted to him by, for example,

17  his mother or fam- -- or her mother or family.

18        THE COURT:  All right.

19        MS. PRESTON:  So I agreed with that assessment,

20  withdrew the proposed enhancement.  I believe it is an

21  aggravating factor, as I said in my memo, under Section

22  3553(a), but that the enhancement does not apply.

23        THE COURT:  All right.  And, Ms. Beitz, you agree

24  that that enhancement should not apply in these circumstances?

25        MS. BEITZ:  Yes, Your Honor.

1          THE COURT:  That's more like a guardian or a foster

2    care or something like that, I presume.  Okay.  All right.  So

3    that just -- so we're all on the same page, that enhancement

4    was not assessed in the pretrial services report.

5          Ms. Preston, you indicated that there are victims or

6    family of the victim present today.  And I do note the

7    tendered victim impact statement that was filed.  You

8    indicated that one of -- that a victim family member, her

9    sister, I think, wished to read the victim impact statement,

10   is that -- or just have it read?

11         MS. PRESTON:  No, Your Honor.  The Minor Victim 1's

12   sister would like to address the Court on behalf -- in

13   addition to the victim impact statement, on behalf of her

14   younger sister, who is still a minor and who didn't feel

15   comfortable being present here today.

16         So speaking on behalf not only from what the mother,

17   who speaks predominantly Spanish, experienced, what the sister

18   experienced from the perspective of having a missing child,

19   essentially, but also how Minor Victim 1 was doing when she

20   was returned and how she is doing today.  So she would like to

21   address the Court in that regard.

22         THE COURT:  And you intend to call her today?

23         MS. PRESTON:  I do.

24         THE COURT:  Any objection, Ms. Beitz?

25         MS. BEITZ:  No.  It is her right to speak, Your

 1   Honor.

 2            THE COURT:  Okay.  You can do so now.

 3            MS. PRESTON:  And would you --

 4            MS. BEITZ:  Your Honor --

 5            MS. PRESTON:  I'm sorry.  Go ahead.

 6            MS. BEITZ:  Your Honor, did we -- and it may just be

 7   I'm not familiar with the order of the Court.  Did we complete

 8   the guideline calculation?

 9            THE COURT:  I did not complete the guideline -- I am

10   going to go through the guideline calculation and the rest of

11   the PSR.  I just thought we would take the victim statement

12   first and then we'll go to that, though.

13            MS. BEITZ:  Thank you.

14            THE COURT:  But I appreciate any -- you jump in if

15   you think I've missed something at any time, because I

16   certainly am capable of it.  So thank you.

17            Yeah, if you want to call your witness.

18            MS. PRESTON:  Thank you.

19            THE COURT:  Ma'am, if you would come forward and be

20   sworn, please.  Raise your right hand.

21            ███████████████ **GOVERNMENT'S WITNESS, SWORN**

22            MS. PRESTON:  May she approach at the lectern or do

23   you want her at the witness stand?

24            THE COURT:  Over here is fine.  You can come to the

25   stand, ma'am.

1    MS. PRESTON:  And, Your Honor, because it is a victim

2    impact statement, I won't be engaging in a back and forth like

3    direct examination.  She would simply like to speak to Your

4    Honor.  I have instructed her, for purposes of the record, to

5    introduce herself by her first name only because she shares

6    the same last name as Minor Victim 1.

7        THE COURT:  Okay.

8                        **DIRECT EXAMINATION**

9  BY MS. PRESTON:

10  Q.    Would you please introduce yourself to Judge Brookman

11  and then provide your victim impact statement?

12  A.    Yes.  My name is ▮▮▮▮▮, and I'm the sister.

13        THE COURT:  Will you push that microphone on just a

14  little bit?  If you would just push it down a little bit.

15  You're fine.

16        THE WITNESS:  Thank you.

17        THE COURT:  Sounds good.  Okay.  Go ahead.

18  A.    And I'm her sister.  So I wanted to address you and let

19  you know that -- that this -- this -- I'm sorry.  That this

20  situation, I mean, has impacted us very much.  Specifically

21  for my sister.

22        I would like to say that I talk to her every day so

23  that -- she just doesn't feel like everybody's, like, just

24  watching her because obviously this -- she knows now that this

25  has a lot of attention.  So it's -- this is definitely

1    impacting her for her daily living, if you know what I mean.

2        So when this happened, I called this guy, this man,

3    and I told him -- I told him, you know, "Do you know where she

4    is?"  Because -- because he has had a lot of communication

5    with her.  And, as far as I knew, they were friends.  So I --

6    since she had mentioned to me that she had a friend, I decided

7    to call him, and I decided to be like -- ask him, "Do you know

8    anything about her?"

9        He told me he didn't know, but that he wished that we

10   do find her, and he wished that we were -- she was able to

11   come back home okay.  And -- but also he did tell me that if

12   he did know anything, that he would let us know and that he

13   would reach out to us.

14       On this day, something just told me that I -- I felt

15   like he was -- he was holding back information.  So I decided

16   in the moment that I was going to go after him because there's

17   -- there's no way he -- to me, he was too calm.  And I doubted

18   him immediately, okay?

19       So the next opportunity that I had, I did go to --

20   back to the police department, and I gave them all of the

21   information that you guys have had so they can look into him,

22   because I did not trust it.  I was like, "There's something.

23   There's something there."  And as a sister, a mother,

24   everything, you know, you just have to go with your gut,

25   unfortunately, right?

1          So -- so I feel relief that we are here today because

2    anything could have happened to her.  She could have been sex

3    trafficked, which we know that that's going on a lot now.  She

4    could have been in a ditch, and we would have never known.

5    Anything could have happened.  And that is one thing that we

6    worry about -- we worry about for families.  This is a

7    situation where we worry about for families.

8          So I really hope that you guys consider how things

9    are impacting victims on these days.  Some people don't come

10   back home.  So for us, it was a horrible, almost, what, like

11   -- it was more than a week.  So that was a horrible time.  And

12   any time that I could, if I had any information, I definitely

13   brought it up.  Every time.  There was -- any time that I was

14   able to do something to push forward for this to find him, I

15   was -- I was there.

16         So I just want you to know that this person lied

17   about his name, lied about everything.  He lied -- now I know

18   his name is Arnold.  And I just want you -- everybody to know

19   that this has impacted her.  More than -- more than us, it's

20   impacting her.  She has -- she has been feeling like -- she's

21   been feeling depression, she's been feeling anxiety of

22   social -- like any social settings, and she almost doesn't

23   want to come out of her room.

24         So this is -- this is definitely impacting her in a

25   way that it's going to be hard for her to like get out of

1    that.  And we're going to work hard with her for it.  We're

2    trying to help her push back, to go back into school, finish

3    off her education, and we're going to make sure that she finds

4    her way.  Because this is -- this is hard for her right now.

5    It really is.

6         So I definitely wanted you guys to hear this out,

7    hear us out.  I think that as parents, we have to go with our

8    intuition.  It's really hard to -- like, I want people to know

9    that we can find our kids, and we can find our siblings, we

10   can find our families in these situations, but we definitely

11   have to push for people like this to go and -- go to jail and

12   stay as long as possible.  Because this person can do it

13   again.

14        And I am -- I'm even concerned that -- like, I hope

15   this man doesn't have children, because this would be very,

16   very unfortunate for any future family that this man has.  So

17   we're -- we're very concerned from this end.  Okay.

18        THE COURT:  All right.  Thank you.

19        THE WITNESS:  Thank you.

20        MS. PRESTON:  Thank you, Your Honor.

21      (Witness excused.)

22        THE COURT:  Ms. Beitz, any record that you would wish

23   to make --

24        MS. BEITZ:  No record.

25        THE COURT:  -- on that, on the victim statement?

1          MS. PRESTON:  Thank you, Your Honor.

2          THE COURT:  Okay.

3          MS. PRESTON:  I'll note that Minor Victim 1's mother

4    is present in court today, but she is not providing a

5    statement.

6          THE COURT:  Okay.  And the Court has -- as I've

7    indicated on several occasions, the Court has received the

8    victim impact statement that was tendered and was filed at

9    Docket 60.  Okay.

10          Mr. Castillo, I want to go through the presentence

11   report now with you, with the parties.  You have a copy of it

12   in front of you?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Yes?  All right.  I'm not going to read

15   it word for word.  I'm going to sort of highlight some of the

16   important spots that I think are -- but we'll go through it.

17   And then you will have an opportunity to speak, if you wish

18   to, with regard to the appropriate sentence.

19          The Government will have an opportunity to make their

20   argument with regard to appropriate sentence.  Your counsel

21   will, too.  But you will also have an opportunity to speak, if

22   you wish to, Mr. Castillo.  You don't have to, but I will give

23   you that opportunity at the appropriate time.

24          So the presentence report, as we indicated earlier,

25   the defendant is pleading -- has pled guilty to Count 1 and

1   Count 2 of the indictment charging transportation of a minor

2   with the intent to engage in criminal sexual activity and

3   coercion and enticement of a minor.  He has been in federal

4   custody since May 11th, 2022.  The defendant is 23 years old,

5   born ██████████.  He is a United States citizen, has a GED

6   as far as school is concerned.

7          Procedurally, the defendant was charged by a criminal

8   complaint in May of 2022, was arrested May 11th of 2022, and

9   went into federal custody at that time.  A two-count

10   indictment was returned here in the Southern District of

11   Indiana, which included a forfeiture allegation.  That was

12   filed on September 8th, 2022.

13          The defendant entered into a petition and plea

14   agreement with the Government, and that was filed on May 23rd,

15   2023, and today was the date that the plea was changed to a

16   guilty plea.

17          Offense conduct-wise, the factual basis provided by

18   the Government during the change of plea colloquy here earlier

19   was detailed, but in sum, the defendant, a young man who lived

20   in Paterson, New Jersey, the Minor Victim 1, a child who lived

21   here in Marion County, Indiana, they struck up -- he struck up

22   an online relationship with her via social media, Instagram,

23   things like that, some online video games like Roblox and

24   things like that.  Discord, Roblox, these are all things that

25   operate in interstate commerce, of course.

1          They began with conversations described by the

2     Government, and I think fairly described, as grooming

3     behavior.  Defendant bought Minor Victim 1 -- bought some of

4     her online artwork, anime, paid her for that using CashApp,

5     and then eventually bought fairly expensive items for her as

6     well, art-related, computer-related items.

7          The online relationship progressed and the grooming

8     continued until -- and it was very clearly of a sexual nature

9     and very clear that the defendant had those sorts of

10    intentions.  Also clear that the victim was a minor, a child,

11    and the defendant concealed his own identity to her.

12         Amazingly, in April and May of 2022, the defendant

13    was able to find an Uber driver who was willing to drive from

14    the East Coast to Indianapolis, pick up Minor Victim 1 and

15    drive her back, $500 to drive her here, $500 to drive back.

16    And she did that.

17         And then from May 3rd -- between May 3rd and May 4th,

18    the defendant had Minor Victim 1 transported from Indiana to

19    New Jersey for the purpose of engaging in sexual activity.

20    And that sexual activity, of course, would be and was a crime

21    under both Indiana law and New Jersey law.

22         The defendant engaged in sexual activity with Minor

23    Victim 1 just pretty much as soon as she got to New Jersey.

24    There, of course, was an investigation and a hunt for Minor

25    Victim 1 after she left, involved law enforcement.

1          Defendant obstructed justice when he lied to law

2    enforcement when he was contacted about Minor Victim 1's

3    whereabouts, even though she was living with him at the time

4    and was in his custody, if you will.  He used an alias when he

5    spoke with law enforcement, he lied to law enforcement when he

6    stated that Minor Victim 1 must have run away due to issues

7    with her family or from other people bothering her, and he

8    told law enforcement that he suspected that Minor Victim 1 may

9    have run away on a whim due to her emotional outbursts, when

10   he knew full well that, of course, she was there with him.

11         Ultimately, about either seven or eight days after

12   leaving Indianapolis, Minor Victim 1 was discovered and

13   recovered by law enforcement there in New Jersey.  She was

14   found as she and the defendant were taking -- were walking in

15   front of the residence there in Paterson, New Jersey.  The

16   defendant provided a statement at that time and admitted to

17   his involvement in these crimes.

18         Of course, there is a very -- a very real victim to

19   this offense.  That victim statement was provided today in

20   open court and also a victim impact statement was filed with

21   the Court as well, which the Court has reviewed and attempted

22   to understand.

23         Defendant has obstructed justice, has been found to

24   obstruct justice by lying to law enforcement, using a fake

25   name.  He has also -- he's also eligible and has received an

1    adjustment downward for an acceptance of responsibility.  He

2    has fully accepted responsibility for his actions at this

3    time, and that's reflected in the guidelines as well.

4            As to the offense level computations, the Court has

5    used the 2021 Guidelines Manual.  The Count 1 and Count 2 are

6    grouped, but as to Count 1, the guideline for that one is

7    2G1.3.  It calls for a Base Offense Level 28.

8            There is a plus two enhancement for misrepresenting

9    the defendant's identity to persuade, a plus two for use of a

10   computer, a plus two for -- because the offense involved the

11   commission of a sex act, and a plus two increase because the

12   defendant knew that the victim of this offense was a

13   vulnerable victim.  All of that results in an Adjusted Offense

14   Level 36 for Count 1.

15           Count 2, similar results.  But Count 2 has Guideline

16   2G1.3 as well.  Base Offense Level 28.  Plus two for the

17   knowing misrepresentations.  Plus two for the use of the

18   computer.  Plus two for the -- because the offense involved

19   the commission of a sex act.  Plus two because the defendant

20   knew or should have known that the victim was a vulnerable

21   victim.  And then an additional plus two for the obstruction

22   of justice when the defendant willfully lied to law

23   enforcement and concealed the fact that the victim was with

24   him.

25           So that results in an Adjusted Offense Level 38.

1   38 being the higher of the -- the greater of the two offense

2   levels, and when they're grouped results in a Level 38

3   guideline offense level.

4        As I indicated, the defendant is eligible for

5   adjustment for an acceptance of responsibility, three levels.

6   That takes the total offense level down to a Level 35.

7        Turning to the defendant's criminal history, he has

8   no criminal history, no juvenile adjudications, no adult

9   adjudications.  His criminal history score is zero.  And that

10  makes him, of course, a Category I.  So Guidelines Level 35,

11  Criminal History Category I.

12       Turning to the offender characteristics and the

13  defendant's background, he was born in New Jersey to his

14  parents, who were immigrants to this country.  He has some

15  relationship with his father but lived most of his adult life

16  and juvenile life with his mother there in New Jersey.

17       He was sheltered, to say the least, raised by a

18  mother who probably -- I mean, certainly has her own mental

19  health issues and pretty clearly passed those on.  He was the

20  recipient of her strange parenting style.

21       The defendant was pulled out of school, public

22  school, in seventh grade.  However, he is a -- he is, by all

23  accounts, an intelligent individual.  He had a knack for

24  working with computers and the Internet, was able to make good

25  money working, doing design game software, software designing

1    and things like that.  And some of that money was put to use

2    in these crimes that are before us today.  But he had lived a

3    very sheltered life because of the overly controlling mother.

4          He's a lifelong resident of New Jersey.  No physical

5    health issues to speak of.  No mental health issues other --

6    well, I shouldn't say that.  He doesn't have -- he has no

7    significant history of mental health treatment.  He has

8    indicated that he has -- since his incarceration he has had

9    some suicidal ideations.  Those began when he was -- actually

10   began when he was 21 years old.

11         No real substance abuse history as well.  Defendant

12   indicates that he drank alcohol starting when he was 20 years

13   old, but that was sporadically, and he hasn't drank anything

14   for several years now.

15         As I indicated, his mother withdrew him from school

16   in the seventh grade.  He has, however, completed and earned a

17   GED while in custody.  He does, fairly obviously, have some

18   significant computer skills, IT type skills.  However, he's

19   never been employed other than through the game software and

20   things like that from home.

21         The defendant does not have any real financial means,

22   no ability to pay a fine, and no fine will be imposed.

23   However, there is a restitution that will be imposed.

24         So that leaves us with the sentencing options here.

25   Under the statute, Count 1 has a minimum term of imprisonment,

1  statutory minimum of ten years, maximum term of life in

2  prison.  Count 2 the same.  The guidelines call a total

3  offense level of 35 and a Criminal History Category I provide

4  for an advisory guidelines range of imprisonment of between

5  168 and 210 months.

6         As far as supervised release is concerned, Count 1

7  and 2 require a term of supervised release anywhere from five

8  years to a lifetime term.  Any multiple terms on the counts

9  would run concurrently.  The guidelines provide for a

10  supervised release term of five years, five years to life, as

11  well.

12        Defendant -- under the statute or the guidelines,

13  these offenses are ineligible for probation.  There are

14  certain mandatory conditions of supervision.  There are other

15  proposed conditions of supervision that have been outlined in

16  the presentence report.

17        Ms. Beitz, does the defendant have any objection to

18  the mandatory conditions or the proposed conditions that have

19  been outlined in the PSR?

20        MS. BEITZ:  He has no objection, Your Honor.  We have

21  gone through each of those, as well as the justifications

22  listed by probation.  We believe each are appropriate, as well

23  as the justifications for them.  And he would waive any

24  reading of these as a part of the judgment, Your Honor.  Thank

25  you.

1          THE COURT:  Okay.  All right.  As far as the fine,

2    the statute provides for a maximum fine of $250,000 as to each

3    count.  The guidelines provide for a fine range of from 40,000

4    to 400,000.  Although, as the Court has indicated, I don't

5    believe a fine would be appropriate here, and there's no real

6    ability to pay that fine.

7          On the issue of restitution, the statute provides

8    that restitution is mandatory.  And according to the plea

9    agreement, the parties have agreed to a restitution amount of

10   $10,000 paid to Minor Victim 1, and that will be ordered as

11   well.

12         So those are the -- those are the findings of the

13   presentence report.  I note no objections.  And we've

14   discussed the different various aspects throughout.

15         We'll now turn to counsel first for the Government

16   and then for the defendant and allow them to make any

17   argument, statement that they wish to make as to the

18   appropriate disposition of this matter.

19         Mr. Castillo, when the lawyers are finished, I will

20   give you an opportunity to speak, if you would like to, either

21   before or after your lawyer, whichever she prefers.  You don't

22   have to speak, but if you want to, you may.  And I will

23   certainly give you that opportunity.

24         Ms. Preston, do you want to go first with any

25   argument regarding the appropriate disposition?

1          MS. PRESTON:  Certainly, Your Honor.  Thank you.

2          Your Honor, it is the position of the United States

3     that a within guidelines sentence and a lifetime of supervised

4     release is sufficient but not greater than necessary to

5     reflect the seriousness of the offense, promote respect for

6     the law, provide just punishment, protect the community from

7     Mr. Castillo, and afford adequate general and specific

8     deterrence.

9          I'll begin first under Section 3553(a), with the

10    nature and circumstances of the offense.  Your Honor, parents

11    of the past could breathe a sigh of relief when their children

12    came home at the end of the day.  They could rest easy,

13    knowing that their child was home, that their child was safe,

14    and in those times parents would know if a stranger was trying

15    to talk to their child, if a stranger was trying to do harm to

16    their child because the house phone would ring.

17         But those days are long gone, Your Honor, because of

18    predators like this defendant and because of things like this

19    (indicating).  A cell phone, a device, an iPad.  Your Honor,

20    social media and gaming have been exploited by criminals like

21    the defendant, who use and abuse those platforms to access

22    children, rendering them vulnerable to abuse and exploitation

23    even when they are home with their parents.

24         Criminals like this defendant can use a cell phone, a

25    computer, to meet children, to groom them, to drive a wedge

1  between them and their families, and even to arrange to lure

2  them away from their parents, 700 miles away, to have sex with

3  them.  That's what this defendant did.

4        Your Honor, he used Roblox.  And I don't know how

5  much familiarity you have with it, but Roblox is an online

6  gaming platform.  It's not one game, it's many games.  And it

7  has 66,000,000 active daily users and nearly 200,000,000 total

8  users, 60 percent of which, Your Honor -- 60 percent at least

9  -- are children.

10        And that's what he used to meet Minor Victim 1, a

11  15-year-old girl.  And he lied to her.  And those lies

12  mattered.  First, he used an alias.  That prevented her any

13  effective -- even though he wasn't a sex offender at the time,

14  so it wouldn't have mattered, but she couldn't even Google him

15  or find out anything more about him.  He used an alias.

16        And he lied, too, about this -- he bragged about

17  having access to online gaming platform industry-types who

18  could connect children like Minor Victim 1 and provide avenues

19  for her to sell her art or provide avenues for other children

20  to engage in online gaming.  Those are all lies.

21        He then spent months and months grooming this

22  15-year-old child over Roblox, over Instagram, and over

23  Discord.  He told her everything that she needed and that she

24  wanted to hear.  He preyed on her insecurities.  He drove an

25  emotional wedge between her and her family, and then he used

1   messaging and Uber to lure her from her own home and travel

2   700 miles away to have sex with her for eight days, until she

3   was recovered.

4          He was able to accomplish all of that without ever

5   stepping foot in the state of Indiana.  All from the comfort

6   of his home behind a computer.  Judge, it just doesn't get

7   more serious than this offense.  Like I said in my lengthy

8   sentencing memorandum, which I won't repeat here, this is

9   every parent's nightmare.

10          I would like to start by addressing a few things that

11   I didn't cover in the sentencing memorandum that I believe

12   make this offense cry out for a guideline sentence, a serious,

13   serious sentence.  As you know, in January of 2022, Minor

14   Victim 1 was 15.  Like millions of children, she loved to play

15   games on Roblox, which was, by the way, rated kid safe.

16          Roblox, like I said, is this multi-game platform, and

17   it's sort of like a cross between social media and gaming.

18   And that's how he gained access to her.  And just like

19   millions of 15-year-old girls, she had low self-esteem.  She

20   felt she wasn't good enough.  She felt she wasn't pretty

21   enough.  And like so many teens, she was desperately searching

22   for validation, for someone, for anyone, to tell her, "You're

23   good enough, you're pretty."

24          And this minor victim was particularly vulnerable,

25   Your Honor.  She was suffering more than most 15-year-old

1    girls.  She had social and emotional deficits.  She would

2    have, as he even acknowledged in a phone call, emotional

3    outbursts as a result.  And she, more than anything, was so

4    desperate for acceptance.

5         And he capitalized on that.  He used that against

6    her.  Because it is so widely used by children, particularly

7    between the ages of 5 to 12 years old, predators do flock to

8    Roblox, to Instagram, to Discord.  And that's why he did it,

9    and that's where he was and why.

10        For months, the defendant told Minor Victim 1

11   everything she so desperately wanted to hear.  And you saw

12   some of those chats.  He told her, Your Honor, that she was

13   special, that she was beautiful.  He used CashApp to buy her

14   expensive things.  And he even knew that her parents, her

15   mother, had set up guardrails.

16        For example, when she tried to sell her online art,

17   she told him, "You have to go through my mom in order to

18   purchase my anime online."  So he knew that this was a child

19   who had a parent who cared about her safety.  And he went

20   through her sister and mother to buy that art.  That's why

21   they had his phone number.

22        He used Amazon to buy her presents.  He used DoorDash

23   to buy her food.  And he told her that he loved her.  And she

24   believed him because she so desperately wanted to believe that

25   it was true.  And as Your Honor noted, it didn't take long for

57

1    that conversation to turn sexually explicit.  You heard the

2    things that he said to her, that he wanted to make love to

3    her, that he wanted to have kids with her, that sex was --

4    even though she didn't know how to do it, it was instinctual,

5    that he wanted to make her a woman in the bedroom.

6         He knew, he believed that she was a virgin and that

7    he was going to, quote, deflower her.  And this went on for

8    months and months and months.  All while that child was home.

9    All behind her family's back.  And all the while, while he was

10   lying to her.  And then he slowly and intentionally began

11   driving a wedge between Minor Victim 1 and her mother and her

12   siblings.

13        She was 15.  And like many teens, she was clashing

14   with her mom.  It makes her no different than most

15   15-year-olds.  And he fed off of that.  And he did so until he

16   convinced her that she, Minor Victim 1, would be better off

17   with him than with her own family.

18        Judge, this defendant, knowing this child was 15,

19   knowing she was vulnerable, knowing she lived with her mother

20   and siblings, manipulated and groomed this child, so that when

21   he arranged for an Uber driver to travel from the East Coast

22   to Indiana, when that Uber driver showed up to her home, that

23   she would just walk out and not say a word to her family.

24        That's how much he had groomed her before she got

25   into that car.  He paid that driver to take her all the way

1    from Indiana to New Jersey, not because he believed she was

2    special, not because he loved her, not because he had her best

3    interests in mind.  Because he wanted to have sex with her.

4    Because he had his own interests and only his interests in

5    mind.

6           He kept her in this teeny, tiny, little room that was

7    sort of adjacent to the home he shared with his mother.  And

8    he had sex with her on the floor, where he threw his dirty

9    twin mattress, over and over.  He kept her there, knowing full

10   well that the police were looking for her, that her sister and

11   mother were trying to find her, and that she was only 15.  For

12   eight long days.  Until we recovered her.

13          I want to talk a bit more about what he knew as he

14   was committing these offenses.  He didn't just know that she

15   was 15.  He didn't just know that she was uniquely vulnerable.

16   She told him in these conversations that she had been

17   suicidal, that she engaged in cutting.  He knew that she was

18   struggling with social and emotional deficits.  She told him

19   that she had been abused in the past.

20          He knew all of those things and exploited it.  He

21   could have said, "Gosh, this is a kid who is really hurting.

22   I could be that kid's friend.  I could see that she gets

23   help."  No.  He exploited it.  He used that knowledge as a way

24   in to groom her and to separate her from her mother.

25          Let's talk about what else he knew.  Like I said

1    before, the defendant knew that she had -- Minor Victim 1 had

2    a mother and a sister who loved her.  They had installed

3    guardrails so that he was forced to communicate with them just

4    to buy her art.  But, unfortunately, those guardrails were no

5    match for this defendant.

6        And about a day after the defendant transported Minor

7    Victim 1 to New Jersey, you heard today in open court that the

8    minor victim's sister called him and messaged him.  This is

9    someone who from the beginning knew something was wrong.  This

10   wasn't a typical runaway, at first when Minor Victim 1 was

11   discovered missing, "Oh, she's probably all right.  She'll be

12   back."

13       No.  Her mother and sister knew something was wrong.

14   And her sister, as you heard her say today, acted on her

15   instincts.  She remembered and knew that she had been

16   communicating with a friend online, that this friend had sent

17   her expensive things.  And she acted on that instinct, and she

18   called and said, "Where is my sister?"

19       And he lied to her.  She was asking and begging for

20   information about Minor Victim 1.  And even after hearing her

21   voice, seeing her plead for information, he lied to her and

22   said, "I don't have any idea where she is."  And I believe the

23   quote is, "I wish you good luck in finding her."  And she's

24   right.  He also messaged, "I'll let you know if I hear

25   anything."

1      What kind of a human being can get a call from a

2    scared to death sibling like that and simply go about their

3    business and continue to have sex with that 15-year-old girl

4    and not say, "You know what, enough is enough.  You need to

5    call your mom.  You need to call your sister.  You need to go

6    home."  He didn't do any of those things.  He continued to

7    hold her for another week, after hearing the voice of her own

8    sister, just begging for any information about her

9    whereabouts.

10      He was also given a second chance to come clean.  As

11    you read, on May 5th, 2022, two days after he had arranged for

12    her to come to New Jersey, detectives called him.  It's a

13    recorded call.  They told him that Minor Victim 1 was missing,

14    that her family was desperately trying to find her.

15      So now at this point not only does he know there's a

16    sister and mother looking for her, he knows law enforcement is

17    looking for her.  He could have and he should have said,

18    "Enough is enough.  You need to call your mother.  You need to

19    call your sister.  You need to go home."  But no.  He lied.

20      He lied to law enforcement and said she was, quote,

21    probably a runaway.  He used his aliases.  He said he lived in

22    California.  In short, he made it harder for us to find her.

23    He could have at that moment said, "This is too much," and let

24    her go home.  But he didn't.  And why?  Because he wasn't done

25    having sex with her.

1          That was May 5th, Your Honor.  She was not recovered

2   until May 11th.  So knowing that her mother and siblings and

3   detectives were searching for her, he kept her in New Jersey

4   so he could continue to have sex with her.

5          This is someone who has zero respect for the law.

6   This is someone who is brazen.  Not the sister, not law

7   enforcement deterred him.  He continued to hold her, to have

8   sex with her, until law enforcement intervened and recovered

9   her.

10          And while she was there, Your Honor, the defendant,

11  as you've read a lot about, lived with his mother, who, by the

12  way, knew full well that Minor Victim 1 was there.  She just

13  didn't want her in her house.  So he couldn't keep her inside

14  the house, so he stashed her away in this tiny, little room

15  with a dirty twin mattress on the floor.

16          And we have messaging between the two of them that

17  occurred during that time period.  And this wasn't all rosy

18  for Minor Victim 1.  He had sex with her.  He had repeatedly

19  used DoorDash to buy the Plan B pill for her so that she

20  wouldn't become pregnant.  He bought condoms.

21          And then to keep her happy, he took her places

22  occasionally, but she had no money, no ability to leave.  She

23  had to ask, you know, "Can you bring me this?"  She couldn't

24  leave and come and go as she wanted to.  And he even treated

25  her to this plushy toy (indicating), which I will talk about

1    in a second, which also shows you the mindset.

2         This is an adult knowing that he has a child with

3    him.  He is buying her a toy.  And he kept her in this tiny,

4    little room, alone, with a few clothes and a mattress, and

5    visited her when he wanted to have sex, until she complained

6    that he wasn't around.

7         And I want to be clear about something.  He had no

8    intention -- I don't know what his game plan was.  He had no

9    intention of returning her.  None.  There are messages between

10   them, Your Honor, showing him in a store buying hair dye for

11   the purpose of changing her appearance so that she wouldn't

12   look the same way.  He was going to change the color of her

13   hair.

14        Based on that, I don't think he was ever going to

15   send her home.  No, it took -- Special Agent Rothermich and I

16   went 36 hours straight of not sleeping and tracing, looking at

17   search warrants, tracing IP addresses to find her, to recover

18   her and bring her home.  He never, never, never gave up.  He

19   was caught with her, red-handed, with condoms in his pocket in

20   New Jersey.

21        Judge, I simply can't say this enough.  This is a

22   criminal who exploited a child in the worst of ways.  I'll

23   address victim impact a bit later on.  But the nature and

24   circumstances of this offense are horrendous, crying out for a

25   serious sentence.

1          Turning to the history and characteristics of

2    Mr. Castillo, there are both mitigating and aggravating

3    factors.  In mitigation, I have read the defense's submission.

4    And, you know, sometimes when we get these I question,

5    especially when it's uncorroborated and it's very

6    self-serving, whether it is true.  But I will say on the

7    record -- and I have spoken to Ms. Beitz -- I know enough

8    about the defendant's mother to believe all of it.

9          I believe that his mother was an absolute nightmare

10    and that he endured a lot of pain growing up.  But, Your

11    Honor, those mitigating factors are dwarfed by the aggravating

12    ones.  There is simply no justification, no excuse, no

13    plausible explanation for luring a child 700 miles away to

14    have sex with her.  None.

15          This wasn't aberrant.  This crime took months.

16    Months to pull off.  He had to groom her from January to May.

17    Thousands of messages.  Every day.  He had to buy her things,

18    expensive things.  He had to send CashApp payments to her

19    mother.  He had to pay a lot of money to get her to travel

20    from here to there.

21          This was cold, this was calculated, and this was

22    planned.  It was not impulsive.  It was a scheme, devious, and

23    brazen.  That is the defendant's character, Your Honor.  And

24    as I address more fulsomely in my brief, these are not the

25    only, we believe, sexually inappropriate conversations that

1    the defendant had had online with minors.  He believed he was

2    communicating with minors.

3         And as I showed you several pages into my brief, I

4    included some messaging between Mr. Castillo and someone he

5    believed was a 12-year-old, where he was saying, "You know

6    what they say, the younger the better," and saying, "I'll rape

7    you.  You're the reason why I'll end up behind bars."

8    Meanwhile, the other person is saying, "You know I'm 12."

9         This is someone who has a serious problem with

10   communicating with minors online and a sexual interest in

11   children that has been longstanding.  This is a child

12   predator.  He is lawless.  He is a danger.  And the public

13   needs protection from him.  And he will not -- as you heard

14   Minor Victim 1's sister say, he won't age out from this

15   offense.

16        He did it all from the comfort of his home, with his

17   mom nearby, sitting in a chair, behind a computer.  He can

18   continue to commit these offenses well into late in life, Your

19   Honor.  The history and characteristics of this offense weigh

20   heavily in favor of a guideline sentence.

21        In terms of deterrence, Your Honor, I would like to

22   address both general and specific deterrence next.  In terms

23   of general deterrence, this case is very important.  It's

24   gained some attention because it is the poster child for how

25   badly things can go wrong when criminals can use supposed

1    kid-safe applications to talk to children.

2        Like I said, it is every parent's nightmare.  They

3    think their kid is safe at home, but in reality, they are

4    being exploited.  And the reason general deterrence is so

5    important here, Your Honor, is that, Judge, all across the

6    United States, parents, especially those parents with tweens

7    and teens, are faced with an impossible choice:  Cut off their

8    child's ability to communicate with the outside world, their

9    friends, or risk their safety.  It's so unfair.

10        I go around and talk to parents in schools and

11    children all of the time about Internet safety.  And what I

12    hear from parents time and time again is, "My child is telling

13    me that everybody is on Instagram, everybody is on SnapChat,

14    everybody is on Roblox, that they will be the one person in

15    their class who isn't."

16        And the thing is, that's true.  That's true.  Most

17    children are on these apps.  And if you aren't, you are left

18    out, and you are bullied at school.  And devices, social

19    media, gaming, is just how our children are communicating with

20    the world.

21        So no more than ever during the pandemic we see -- we

22    saw the rise in the use of these gaming applications like

23    Roblox.  And that's when Roblox's popularity skyrocketed.  It

24    skyrocketed during the pandemic.  Like I said, 66,000,000

25    daily active users.  Over 200,000,000 total.  60 percent of

1    which are children between the age of 5 and 12.  The number of

2    registered Discord users rose from 45 to over 300,000,000 by

3    2020.  And there are 2.35 billion Instagram users, many of

4    which are children.

5        Judge, predators like the defendant know that

6    children are on these social media applications.  They know

7    they're on Roblox.  And they're exploiting them every day.

8    We're seeing it more and more.  There is a need to send a

9    message that if you engage in this type of criminal behavior

10   with a child, you will be punished greatly for it.  You will

11   serve a lengthy sentence for it.

12       There is a strong need, too, for specific deterrence.

13   As I said, this defendant won't age out of this offense.  He

14   can do it from the comfort of his own home even when he is

15   elderly.  And I don't know if today, even today as he sits

16   here, he gets it.

17       When he was interviewed by law enforcement, he

18   portrayed himself to be a hero, that he was doing her a favor,

19   that he thought she had a bad -- he told them, "Oh, I think

20   she had a bad home life.  I was just trying to help her."

21   That is not true, to put it mildly.  She wasn't in a bad home.

22   He took her from a good home, and he exploited her for eight

23   days.

24       I would like to end by addressing the victims of this

25   offense.  Judge, as I said in my brief, I can't even imagine

1    it.  To wake up and be a mother and find out your child is

2    gone, your child is missing.  She was 15.  And her mother knew

3    she was vulnerable.  They were beyond terrified, Judge.  They

4    were beside themselves.

5         They were begging the police.  They were going back

6    and back and back to the police department for help.  This

7    poor mother, because of the defendant, was left saying, "Where

8    is my child?  Who is she with?  What is happening to her?  Is

9    she even alive?  And if I see her again, will she ever be the

10   same?"

11        No parent should have to go through that.  No parent.

12   It is horrific.  And no parent should have to endure the

13   fallout either.  Judge, after we delivered the news that we

14   had recovered Minor Victim 1, that she was 700 miles away in

15   New Jersey, we had to tell this family that she was taken to

16   the hospital, that she potentially had thrown away her

17   underwear so it couldn't be examined, and refused a rape kit.

18        We had to deliver the news to this poor family that

19   this child had sex with this individual for the eight days

20   that she was there.  The sound a mother makes when hearing

21   that news is not for the faint of heart, Judge.  I have spent

22   a lot of time with Minor Victim 1's mother and sister.  As you

23   know, they are here today.  And they love her so much.

24        So many parents, you can imagine, having first

25   recovered from the initial relief of, "Oh, my God, my child is

1    alive.  Thank God, I just want her to be alive," a lot of

2    parents' next response would be anger.  "How could you do this

3    to me?  How could you put me through this?  How could you

4    leave, you know, in the middle of the night?  I didn't know

5    where you were."

6         They never were that way with her.  They got it from

7    the beginning.  A child is powerless when dealing with a

8    criminal adult.  They knew and have always understood that she

9    was duped, that she was tricked, that she was exploited, and

10   that none of it was her fault.  And they have been steadfastly

11   supporting her, even when she was angry at the world,

12   including me, including the FBI, including them.

13        The defendant needs to be punished for what he did to

14   this mother and her family.  There are not words harsh enough

15   to capture the pain he has put them through and the pain they

16   continue to endure.

17        And I'll end with Minor Victim 1.  Judge, you talk to

18   any adult woman or parent of a teen, they will tell you how

19   hard it is being a tween, being a teen.  It is a necessary but

20   difficult rite of passage.  And it was even more difficult for

21   Minor Victim 1.  She was going through so much.  She was so

22   vulnerable.

23        And tragically, instead of meeting a friend online,

24   she met a sex predator and believed they were in a

25   relationship and believed that he loved her.  So much that she

1  left her family and threw a fit when she was recovered.

2  Judge, she was so skillfully groomed and manipulated that she

3  didn't see herself as having been saved by the FBI when they

4  found her walking down the street with him.  She saw law

5  enforcement and her family as the enemy.  She saw us as

6  someone who ripped her from her boyfriend.

7          And just to give you an idea of how far gone she was

8  at this point, in addition to tossing her underwear, refusing

9  a rape kit, she was openly enraged with law enforcement,

10  incensed at her family for having the gall to issue an AMBER

11  alert.

12          Even weeks after that, she's back, she's in

13  Indianapolis, she sat in my office with Special Agent

14  Rothermich and others, and she was engaging in horrible

15  self-blame.  Because that's the next step, right?  It was all

16  her fault.  It wasn't his fault.  It was all her fault.  And

17  that is very common for victims of sexual offense.  She

18  thought we were being very unfair to Mr. Castillo.

19          Now, to illustrate just how far that went in her

20  mind, we had to, of course, interview her and ask her, "What

21  kind of things happened to you when you were in New Jersey?

22  What kinds of things did you do?  What evidence might be out

23  there that we can collect?"  And we asked her, "Did he buy you

24  anything when you were there?"  And she said, "Yes, he bought

25  me a doll.  He bought me a plushy doll."

1        And we knew we didn't have that.  And we said, "Well,

2    where is it?"  "I have it.  I brought it home."  And we told

3    her we needed it, that we needed to put it into evidence in

4    case this case went to trial.  And she was so attached to it

5    that she initially refused to give it over.

6        We eventually had to send a special agent to her

7    house to get this back from her (indicating).  She didn't want

8    to give it up because she was so attached to it because he

9    gave it to her.  This child, who is already suffering, has

10   gone through so much, and the defendant treated her like a

11   toy, something that he could simply play with and eventually

12   discard.

13       As you heard today and read in her letter, she is

14   doing much better now.  It's taken more than a year, but she

15   realizes now who is to blame.  It's not her.  It's not law

16   enforcement.  It's not her family.  It's him.  I know you read

17   her victim impact statement, and she told you how her life has

18   been forever altered because of the defendant.

19       She told me she's been robbed of her sense of safety,

20   her ability to trust, her belief in the goodness of humanity,

21   and that these scars will remain with her forever.  The

22   emotional toll she said of this ordeal is immeasurable.  And

23   she has difficulty, of course, trusting others now.  And it

24   has had a great impact on her mental and emotional well-being

25   to this day.

1          She should never have had to endure this, Judge.

2     This is something that she shouldn't have had to survive.  But

3     she has.  But her pain will be life-lasting.  Which is why the

4     United States is asking for a guideline sentence and a

5     lifetime of supervised release so that Arnold Castillo can

6     never do this again.

7          Thank you, Your Honor.

8          THE COURT:  Thank you.

9          Ms. Beitz, would you prefer to go first, if your

10    client wants to make a statement?  Would you prefer he goes

11    first?  What's your preference on order between you and your

12    client?

13         MS. BEITZ:  Mr. Castillo will speak first.

14         THE COURT:  Okay.  Mr. Castillo, if you want to --

15    you, of course, have a right to make a statement.  You can

16    make it from counsel table.  You can proceed when you're

17    ready.

18         THE DEFENDANT:  Your Honor, I would first like to say

19    I'm sorry to the victim and her family.  I've had a lot of

20    time to reflect on all of the things that happened, and I feel

21    for what I've -- the guilt -- the guilt I feel I just can't

22    put into words.

23         To the victim's family, I'm sincerely sorry for the

24    terror I must have caused you.  What I put you through is

25    inexcusable, and I can't apologize enough for it.  If I could

1    say anything to the victim, it would be how sorry I am for the

2    absolutely selfish actions I took.

3         At the time, I thought my motives were good.  But I

4    was -- I was definitely wrong.  I broke your trust and gave

5    you false expectations.  This wasn't your fault.  It's mine

6    and mine alone.  As the adult, the responsibility to make

7    decisions fell on me.  And I chose poorly.  I had no right to

8    do what I did, to cause you and your family this much

9    suffering.  Not a day goes by without me wishing I could take

10   it all back.

11        I also would like to apologize to the Court for my

12   actions.  Selfishly, I did not think about the pain I would

13   cause the victim and her family.  Though as I stand here now

14   as a 23-year-old, I understand that I'll be incarcerated for

15   at the very least ten years.  But I have committed myself to

16   using the time wisely and getting the help I need.  And I will

17   continue to do so in order to strive to being a better person.

18   Again, I am truly sorry.  And I pray someday you can find it

19   in your hearts to forgive me.

20        That's -- that's all I have to say.

21        THE COURT:  Okay.  Thank you.

22        Ms. Beitz, any statement?

23        MS. BEITZ:  These are some of the most difficult

24   cases that come before the Court.  And I would say that any

25   case involving a child, a child victim of any type, is a very

1    difficult case to come before the Court.  It's a tragedy.

2    Because any time that a child is hurt, there's devastation

3    that follows for the rest of that child's life.  There is no

4    question about that.  And you will hear no arguments from

5    anybody on this side of the room when it comes to that fact.

6         So I want to make clear that my statements today are

7    not meant in any way to minimize the pain that Minor Victim 1

8    has been through.  It is not meant in any way to minimize the

9    pain that her sister and her mother, their friends and family

10   and community, have been through in going through this case.

11   That is valid.  That is important.  And it is something that

12   this Court must consider.

13        But that's not the end of the evaluation here.

14   That's not where the law says that the Court stops.  I would

15   agree with the statements that I heard both from my client and

16   from Ms. Preston.  Inexcusable.  No justification.  That's

17   accurate.  His actions were inexcusable.  There is no

18   justification for a crime of this type ever happening to any

19   child.  No child earns it.  No child deserves it.  But, again,

20   that's not the end of the analysis here for the Court.

21        The Court is required to take that information and

22   balance it against who Mr. Castillo is, both who he was at the

23   time that the offense was committed and also who he is sitting

24   here today.  And it's trying to take all of that information,

25   all of those broken pieces.  Because, in reality, that's what

1    you have in front of you.

2         You have two very broken families here coming before

3    the Court, and the Court is tasked with the solemn

4    responsibility of trying to put something together that seems

5    fair, that seems just, and that seems reasonable.  That

6    doesn't mean that I am going to think it's reasonable, that

7    doesn't mean that my client is going to find it reasonable, or

8    that the family would find it reasonable.  It has to be

9    reasonable under the law, and that requires the Court to look

10   at all of the factors.  And yes, it requires the Court to

11   consider the victim, but it also requires the Court to

12   consider Mr. Castillo.

13        So the information that we provided to the Court in

14   our filing and what we looked at and provided to you about his

15   background, his history, his characteristics, the Court said

16   that it certainly looked like a strange parenting style.

17   Well, I would describe it in more strongly -- strongly-worded

18   phrases than that.

19        It was abusive.  It was horrific.  Ms. Preston is

20   correct when she said that it didn't take much for her to

21   believe what we had provided, when often prosecutors are

22   skeptical about what we say, they don't believe it, they think

23   that we're making something up that's incredibly self-serving.

24        But let me tell you where we started learning the

25   information about Mr. Castillo's background, his history, and

1    his characteristics.  It was from the search of his home that

2    was described to us by the FBI agents that were there, and it

3    was from Minor Victim 1 and her forensic interview.  It was

4    not from Mr. Castillo.

5         When we met him initially, Mr. Castillo had nothing

6    to say about making excuses for his behavior, describing his

7    background, history, and characteristics as the reason why

8    this happened.  It was through our own investigation that we

9    were able to discover this information and then discuss it

10   with him.  Because what the FBI agents found when they went

11   into this very strange parenting style household was what you

12   saw described.

13        There was one single bed that was shared by

14   Mr. Castillo and his mother.  His whole life.  At the age of

15   21, when he was arrested, he shared a room with her, in a bed,

16   where he had been his whole life.  There were no blankets.

17   And we know that that's true, just not from the pictures, but

18   also from the forensic interview of Minor Victim 1.  Because

19   she specifically told the interviewer that when she made the

20   decision to go to New Jersey and pack her things, she took

21   blankets with her because she knew there weren't going to be

22   any blankets there.

23        She was aware of Mr. Castillo's situation when she

24   went there.  And again, as a child, we don't expect her to say

25   anything about that.  We don't expect her to do anything about

1    that.  She's a child.  But she was able to recognize that,

2    even as a child, not knowing the full story.  And it was her

3    that told the forensic interviewer that Mr. Castillo slept in

4    the bed with his mother.

5         She was the one who disclosed that information that

6    started us down the road of asking some of these questions

7    that, as the Court can imagine, are horrific to have to ask

8    anybody, but it's especially horrific to have to ask somebody

9    who we just met and are representing in a case in which

10   they're facing a mandatory minimum of ten years.

11        But over the process of lengthy, lengthy interviews,

12   a flight by my mitigator up to New Jersey to actually see the

13   home, to attempt to speak to his mother, to speak to his

14   father, to speak to his uncle, that we were able to piece

15   together what you see in the sentencing memorandum.

16        He doesn't come in front of you like any other

17   defendant has.  And that's what makes these cases so

18   incredibly difficult when it involves a child.  Because when

19   it involves a child, especially in a case like this, there can

20   be multiple victims in the room.

21        The child is a victim.  And absolutely the judge has

22   to consider that, and you should consider that.  But that

23   doesn't mean that Mr. Castillo is not also a victim that the

24   Court can consider as well.  Broken pieces that the Court is

25   being asked to put together and come up with something fair.

1           But it is from that broken place that Mr. Castillo

2    met Minor Victim 1.  And I need to start back at the

3    beginning, where Ms. Preston said that she found an

4    aggravating factor that prior to him meeting Minor Victim 1,

5    Mr. Castillo was already on Roblox, he was already creating

6    content, he was already using some of his intellect, as the

7    Court described it, and his IT skills to be able to start

8    creating content for Roblox.

9           He was a minor when that started.  He himself was a

10   minor when that started.  The conversations that are described

11   in the Government's sentencing memo that they find

12   aggravating, and as he was discussing these 12-year-olds and

13   saying some things that were incredibly shocking, he was a

14   minor as well.

15          The Government wasn't able to figure out whether or

16   not any of these individuals that he was speaking to were

17   actually minors, and they made that clear within their

18   sentencing memorandum.  And I appreciate that.  But when he

19   started on Roblox, he himself was a minor.

20          He was pulled out of school when he was in seventh

21   grade and put on a computer, where he did demonstrate that he

22   had some IT ability, as the Court describes it, but he had

23   zero -- and I mean zero -- social confidence.  He clearly was

24   not communicating with anybody in a way that would make them

25   want to communicate with him.

1    As you can see by the way that he's speaking to

2    people on here, he is saying things that would be completely

3    out of the realm of possibility, if you think about it from

4    the perspective of an adult, when he hops on Roblox and he

5    creates a YouTube video in which he puts out there that people

6    are calling him these names.  And he puts up the images.  He

7    puts up the images -- I'm sorry -- of the text messaging.  I

8    mean, he puts hisself out there for him.  He wants to defend

9    himself under these circumstances.

10    Again, no social competence and understanding that

11    that's not going to make him look any better at all.  But he

12    puts it out there for all to see.  It wasn't hard for the

13    Government to find.  You just Google it.  You Googled it and

14    you found it.

15    But it was from that place that he met Minor

16    Victim 1.  And yes, he didn't tell her his name.  He didn't

17    give his real age at the time.  He lied to her.  But based on

18    her forensic evidence, an interview that she provided, she

19    lied to him, too.  Not blaming her at all.  Not blaming her at

20    all.  Let me make that clear.  I'll say it a third time.  Not

21    blaming her at all.

22    She herself was trying to navigate this world, trying

23    to maybe get her art sold.  She was trying to meet people and

24    trying to make herself, I guess, appealing to talk to

25    somebody.  And so she also lied to him about her age.  Now,

1    let me be also very clear.  That as time went on, he knew her

2    age.  By the time that she got in an Uber and was on her way

3    to New Jersey, he knew her age.  He knew she was a minor.

4         But even if he hadn't, that wouldn't have been a

5    defense.  She was a minor.  She got in an Uber, and she went

6    all of the way to New Jersey.  And she met with him.  And the

7    two engaged in contact that was illegal.

8         Now, if you were just looking at whether or not this

9    offense occurred, to cite Mr. DeBrota, who would famously say,

10   "Full stop.  Full stop.  It's illegal.  We're done.  There's

11   no further question," and I would agree as to whether or not

12   the offense was committed, that's an appropriate place to say

13   "full stop."

14        But it comes to the question of how or why this

15   occurred and what this Court needs to do to ensure that it

16   doesn't happen again.  We don't just stop at "full stop"

17   there.  We have to ask more questions.  We have to dig a

18   little bit deeper.

19        So by the time that she had come to New Jersey, he

20   knew she was underage.  And I respect the Government's

21   characterization that much of this could look like grooming

22   behavior and that it was entirely his intention to have her

23   isolated, to have her brought just to him so that nobody else

24   would know where she was.  But that doesn't necessarily pan

25   out with some of the other facts that we have here.

1          Prior to her getting in that Uber and coming to New

2    Jersey, he made a 911 call.  During a time that she was

3    communicating with him, he did become concerned about her.

4    Which is why we agreed.  Which is why we agreed that he knew

5    that there was some vulnerabilities about her and where she

6    was in her life at that time.  Because he made a 911 call and

7    asked the police to go to her home and check on her.

8          Now, that's outlined in the Government's memorandum,

9    and you can see that outlined there as an aggravating factor,

10   that they believe that was somehow aggravating.  But I ask the

11   Court to look at it from a different perspective.  If his full

12   intent at that point in time was to isolate her, to keep her

13   away, that he really cared nothing for her at all, it would

14   not be the police that he called and asked to go to her door.

15         Law enforcement is standing right there.  If she had

16   wanted to at that point in time, she would have been able to

17   disclose anything that she wanted to.  I know the Government

18   would say at that point she was already groomed by him to such

19   a point, but if the intention was to groom her, isolate her,

20   and keep her away, he would not have sent the police to her

21   door to alert her mother.  He would not have sent the police

22   to her door to check on her, which made her incredibly angry

23   at him.

24         And she did stop communicating with him for a while.

25   There was a period of time, that the Court can note by looking

1  at that, between when the last communication happened and when

2  later she reached out to him, according to her forensic

3  interview, when she reached out to him and said that she

4  wanted to leave.

5        Now, I understand that during her forensic interview,

6  I wholly agree she was angry.  She was angry at the world.

7  She was angry at her mother.  She was angry at her sister.

8  She was angry at the police.  She was angry at everybody.  And

9  at the end, she was angry at Mr. Castillo.  Because it was

10 Mr. Castillo who told the police that they had engaged in

11 sexual contact when they were together.  Because she adamantly

12 denied it.

13       As Ms. Preston said, she wouldn't submit to any kind

14 of an examination.  She threw her underwear away.  When she

15 was asked directly whether or not something happened, her

16 response was to look this adult in the eye and say,

17 "Absolutely not."  She told the adult she was getting angry

18 with her for asking the questions.  She would tell the adult,

19 "I don't want to talk about that.  You're pissing me off."

20       All of these things she was telling this as a very

21 vocal individual, able to advocate for herself, until the end,

22 when she was told that Mr. Castillo, the adult, made several

23 choices.  And, quote, "One of those choices he made was to

24 tell us about the sexual contact you had.  He told us you had

25 sex."  And the look on her face and the anger you could see

1    from her was incredibly clear.

2         Had Mr. Castillo not told the police what had
3    happened, we don't know whether Minor Victim 1 would ever have
4    said anything based on how she presented.  But as the adult,
5    he made the choice to tell them what had happened.  Now, I
6    understand Ms. Preston is putting it in the frame of he saw
7    himself as the hero of this situation.

8         And, you know, two things can be true at the same
9    time.  He could both be completely wrong about his actions,
10   what he did, and how he went about it, but also still think,
11   based on the information he had at the time and what she was
12   telling him, that there was a part of him that thought this is
13   something that she wanted, this was something that she had
14   asked, to come this direction.  He's wrong, cold wrong, about
15   that.

16        But the person that was presented at that time to the
17   police was somebody who had come out of the environment that
18   you see described in the sentencing memorandum.  Where there
19   were no boundaries.  Where he didn't have the ability to make
20   communications in an appropriate way.  Where he himself was
21   also isolated.  He was also not socialized in any way at all.
22   And so it was the collision of two things that led to this
23   absolute devastation that we have in front of us here today.

24        I would argue to the Court that during the time that
25   she was with him, based on her statements, as Ms. Preston

1  said, he should have, he could have called or told her to call

2  her family, to call and let them know where she was.

3  According to her forensic interview, Your Honor, he did.

4       Based on her forensic interview, she was fully aware

5  that he had talked to her family and that he had talked to the

6  police.  This is her forensic interview, what she said.  That

7  he said, "I think your family is looking for you."  And her

8  response was, "Don't worry about it."  He said to contact --

9  "Arnold told me to contact them, and he encouraged me to tell

10 them how I felt."  And she said to him, "My family is not

11 going to listen to me."

12      Again, he could have.  He should have.  He did.  Now,

13 as the adult, there is no excuse for him not telling them

14 where she was.  There is no excuse for him not taking her to

15 the police station himself and turning her in.  All of those

16 things should have happened.  But when we look in the context

17 of what was going on at the time, the Court has to look at it

18 from both sides, the history and characteristics of the

19 defendant and the facts and circumstances surrounding the

20 offense.  And they're muddy.  They're muddy.

21      But at the end of the day, he did it.  And that's why

22 he pled guilty.  But the manner in which it happened, the way

23 in which he presented himself to her, the way she presented

24 herself to him, all matter in determining, one, why did this

25 happen; and, two, what does this Court need to do to ensure

1    that it doesn't happen again.

2          And that's important, because of the range that

3    Congress has given to you, to make the determination what is

4    appropriate in this case for Mr. Castillo.  Because of the

5    environment that he was raised in, the manner in which he did

6    get socialization, he didn't get education, he didn't get a

7    lot of medical care, he didn't get mental health treatment

8    when he needed it.  All of the things that he did not get

9    matter.  Because in the last two years what the Court has seen

10   -- in the last 470 days -- excuse me, 470 days -- is that even

11   a little bit of that, a little bit of that, helped him

12   immeasurably.

13         He was scared to death when he came into custody.  He

14   had never been around that many people.  He had never slept in

15   a room with anybody but his mother.  And here he is in jail,

16   surrounded by people he don't know, speaking languages he's

17   not aware of.  In New Jersey, he was scared to death.  And

18   then he gets transported to the Southern District of Indiana.

19   And by the time he got here he was petrified.  He had been

20   shuttled around.  It took the marshals a long period of time

21   during COVID for him to get here.  He was absolutely

22   petrified.

23         And he looks nothing like he does now when he showed

24   up.  Look at that picture.  He is significantly smaller.  He's

25   healthier.  He actually has some color in his face.  He's had

1    regular meals.  He's had some socialization.  And he's had

2    some education.  He had to work really hard with that seventh

3    grade education to be able to pass his GED.

4            How do I know that?  I know that because my client

5    was -- another client was the one who tutored him through the

6    process, and it took a really long time to get him there.

7    They worked together tirelessly to be able to get him to pass

8    that GED.  And he is incredibly proud, as he should be, of

9    that.

10           If we give him the training, if we give him the

11   treatment, if we give him the access, he is showing the Court

12   that he is somebody who can take that and overcome what has

13   happened to him in his past.  That's something the Court needs

14   to consider in determining what do you need to do to ensure

15   this doesn't happen in the future.

16           And I understand the victim's family saying, "I hope

17   he doesn't have children."  I understand that anger.  I

18   understand the feeling that, "We just -- we just don't want to

19   hear anything about him.  We just want him to go away for a

20   long time."  That's very justified.  There's nothing wrong

21   with that feeling.  They have been gravely hurt by his

22   actions.

23           But, again, that's not the end of the consideration.

24   Because the Court has to ask can he get better, can we give

25   him educational, vocational training, medical, mental health

1    treatment in an effective manner that will ensure that when he

2    comes back to the community he isn't going to repeat this,

3    that he has other ways to communicate with individuals, that

4    he has a better sense of boundaries, that he has a better

5    sense of himself, that he himself has a little bit of

6    self-esteem, that he himself isn't somebody who is going to

7    hop online to try to find attention from someone.

8         All of those things have been shown to you as

9    effective for Mr. Castillo personally in just the limited

10   amount of time that he has been away from his mother.  In that

11   limited time, he has gained some clarity.  You've heard his

12   statement.  You've heard his statement.  No excuses.  He was

13   the adult.  She was the child.  This should never have

14   happened.  It is inexcusable.

15        He has grown up.  He's gotten his GED.  He has been

16   able to start establishing somewhat of a healthy relationship

17   with his father, separate from his mother's influence.  And he

18   hasn't had communication with his mother hardly at all since

19   he's been here because, as you've read in there, she has

20   completely disowned him.  She sees this as something that he

21   has done to her by removing himself from there and no longer

22   being able to take care of her.

23        And he has also found individuals in a faith

24   community who are holding him accountable right now.  And all

25   of that is incredibly important in looking at what this Court

1  needs to do to ensure that he gets it and that he's not going

2  to be in this position again.  And it's even more important

3  right now.  Let me tell you why.  He is 23.  He was 21 when

4  this happened.

5       What we know about brain development in young men is

6  that his brain is right now in the final stages of

7  development.  It won't stop developing until he's 25.  And the

8  very last part of the male brain to develop is the frontal

9  lobe that controls judgment and impulse control.  And that's

10  exactly what was going on in this case.

11       This isn't a scenario where we're looking at somebody

12  who has an attraction to children.  Now, Minor Victim 1 is 15.

13  She is a child.  She is a minor.  But the attraction was not

14  to a pre-pubescent child.  There wasn't any child sex abuse

15  material in this case.  No images.  The attraction was to a

16  post-pubescent female.

17       So the Court isn't having to be concerned about

18  putting him in some kind of a treatment where we need to break

19  this attraction that seems somewhat to be impossible to break.

20  How do you break that attraction?  You don't have to worry

21  about that in this case.  That's not what we're dealing with

22  here.  We're dealing with a judgment concern.  This is a

23  judgment issue.  He knew it was wrong.  He did it anyway.

24       Understandable when you look at all of the facts and

25  circumstances why his judgement was skewed.  But also just

1    from a physiologic standpoint, his brain is finishing

2    development right now.  And right now is the absolute pivotal

3    time for him to be getting that treatment, for him to be

4    getting the intervention, for him to be getting the classes

5    and training from the Bureau of Prisons.  And right now, while

6    that is not available to him, he has sought it out himself,

7    and we are seeing that it is paying dividends in who he is now

8    and who the Court can hope him to be in the future.

9         None of us want him to be back in the courtroom

10   again.  None of us want him to repeat this conduct.  No

11   family, as Ms. Preston said, should ever wake up not knowing

12   where their child is.  It happened in this case.  Punishment

13   is necessary.  But we're asking the Court to make that

14   punishment reasonable and factoring in not just everything

15   that happened, all of the facts and circumstances surrounding

16   it, the gray and the muddy things that happened that can be

17   looked at from both sides.

18        But I also ask the Court to consider what we gain

19   from the incarceration that he's looking at.  This is a case

20   that has a mandatory minimum of ten years.  This is not a

21   mandatory minimum case.  I'm not going to ask the Court to

22   impose the mandatory minimum in this case.  The guidelines

23   call for 168 to 210 guideline sentence.  Ms. Preston is asking

24   and advocating for that.

25        I'm asking the Court to impose a sentence of

1   144 months.  That is not the mandatory minimum.  I would

2   recognize it is below the guidelines.  But there are things

3   that I have described to this Court, argued to this Court, and

4   writing was provided to this Court, that are not encompassed

5   within the guideline range.

6         And so while the Court is required to consider the

7   history and characteristics of the offender as one of the

8   conditions under the 3553(a) factors, there is no numerical

9   quantity to that.  We don't give somebody minus two points

10  because they had a terrible childhood or minus three points

11  because they themselves were abused or minus four points

12  because they have no education.  Because they were isolated

13  themselves.  Because they were abused.  Because they were

14  living under the thumb and terror of a horrible, horrible

15  mother.  There is no number that you can put to that.

16        The guidelines couldn't even do that if you could

17  because it's so individualized in determining what's

18  appropriate.  That falls to your solemn judgment.  It falls to

19  you to determine what, if anything, that has to do with an

20  appropriate sentence in this case.  And I would argue to the

21  Court that it is important.

22        I would argue to the Court that because the

23  guidelines don't think about those things, don't encompass any

24  of those things, but Congress requires that you do.  It

25  matters that you do.  It matters that we look at that and make

1    a determination that we have to say not every offender that

2    comes in front of us is situated the same.  Because an

3    offender that came in front of you who is 45, with a fully

4    developed brain and a great childhood and a great job and had

5    been to college, would have the same number as Mr. Castillo,

6    who sits here at 23, with a horrific childhood, with low

7    social competence.  The judgments were the same, the numbers

8    would be the same.  But the sentence should not be because it

9    wouldn't take into account all of the factors that you are

10   required to take into account.  These are difficult to

11   compare, but the Court is required to try.

12           So I ask the Court to keep all of those things in

13   mind when you determine what an appropriate sentence is.  Why

14   I'm asking for something a little lower than the guidelines,

15   taking into account the 3553(a) factors is also another

16   factor, and that is to get him into treatment as soon as

17   possible.

18           One of the problems we have with the Bureau of

19   Prisons is that they do not treat sex offenders until the very

20   end of their sentence.  They get no treatment at all until the

21   last 48 to 36 months of their treatment.  Now, sometimes that

22   might not matter.  Sometimes you're looking at somebody who is

23   going to be doing 50 or 60 years in prison on cases like this.

24   I've seen people with life sentences on cases like this.  And

25   does it matter then when we're getting them the treatment?

1    Probably not.

2         But it matters in a case like this.  Because even if

3    the Court were to give him the upwards of the high end of the

4    guideline, the reality remains that Mr. Castillo is getting

5    out of jail.  He's 23.  He'll be able to serve that sentence

6    and then come back into the community at an age where he could

7    get a job, where he could be able to pay into Social Security,

8    or he could, if he wanted to and he was healthy enough, have a

9    family, start a business, all of these things.  He's able to

10   do those things because of his age.  So that treatment matters

11   a lot.  And it matters that he gets it as soon as possible.

12   Because, again, he will get out.

13        And when it comes to talking about what's going to

14   happen when he gets out, I understand the victim's family's

15   concern.  They just want to know that they're safe.  They want

16   to know that other children are safe.  And there are a

17   plethora of rules that he is going to have to follow when he

18   gets out.  The first being he's going to have to register as a

19   sex offender.  So it would be on notice if somebody were to

20   Google him.

21        He won't be able to have devices that he hasn't told

22   probation about.  He won't be able to have accounts that

23   probation isn't aware of.  And they do spot checks.  They

24   check all of the time.  I know that because, unfortunately, I

25   end up with clients sometimes from those spot checks.

1      The advancements that we have in technology now to be

2   able to track offenders, to be able to track movements

3   online -- like in this case, the technology that allowed them

4   to find Minor Victim 1 was because Minor Victim 1 had a tablet

5   with her when she was with him in New Jersey that she was

6   logging into online.

7      I know Ms. Preston is characterizing this as that he

8   had complete control of her.  And I don't disagree he had

9   control.  I might suggest that the word "complete control" of

10  her movements and what she was doing would be a little bit

11  much considering the facts.  First and foremost, they were

12  outside.  She wasn't locked in the room.  She, by her own

13  admission, had a key to the room.  While she was there, she

14  wasn't just sitting there hiding in the room.

15     Ms. Preston told you there was some communications

16  between the two that were pretty angry because she was mad

17  that she was in there.  She wanted to go out and do something.

18  And he did.  He took her out to do something.  They went out

19  to look at waterfalls.  They went out to have Chinese food.

20  They went out to get pizza on one occasion.  These are all

21  things that she described happened while she was there.  So

22  they were out in public during this time.

23     So it was because of advancements of technology that

24  they were able to find her.  But technology is only getting

25  more and more and more advanced.  We don't know how we're

1  going to be able to track people in a decade.  I just think

2  about when I started here and the level of sophistication that

3  we now have to be able to do investigations.  We now have a

4  dog that can sniff out the one little piece of chemical that

5  keeps all these devices from overheating.  He can find them

6  through walls, he can find them buried in the ground.  That

7  was impossible ten years ago.

8        So the way that we're going to be able to track

9  individuals like Mr. Castillo for the safety of the community

10  in ten years is going to be vastly different than it is now.

11  It's only going to get stronger and better.  And so I do

12  believe we can have some confidence that even if he were under

13  the rules now, that our federal probation office has the

14  ability and the resources to ensure that the community is kept

15  safe.

16        I want to end exactly where I began, by saying that

17  none of my statements, none of them, were meant to be taken by

18  anyone in this room, especially the victim's mother or her

19  sister, as anything other than trying to put into context some

20  of the facts of this case for the Court.

21        My client was the adult.  Minor Victim 1 was the

22  child.  He had a responsibility to behave as an adult, and he

23  did not.  And that is why he is sitting here.  But I do

24  believe it is important that if the very last thing she hears

25  is that exact thing, that no matter what else is said here

1    today, my final words were:  He was the adult.  She was the

2    child.  He is responsible.  She is not.  And we ask the Court

3    to deliver a fair sentence that takes into account all of the

4    factors presented to you today.

5              THE COURT:  All right.  Thank you, Ms. Beitz.

6              After calculating the guidelines and hearing the

7    arguments of the parties and the statement from the defendant,

8    it's now my job to consider the relevant factors set out by

9    Congress in Title 18, United States Code, Section 3553(a) and

10   ensure that I impose a sentence that I believe is sufficient

11   but not greater than necessary to comply with the purposes of

12   sentencing.

13             Those purposes are the need for the sentence to

14   reflect the seriousness of the crime, to promote respect for

15   the law, to provide just punishment for the offense.  The

16   sentence should also deter criminal conduct, protect the

17   public from future crimes by the defendant, and promote

18   rehabilitation.

19             In addition to the guidelines and the policy

20   statements, I must also consider the nature and circumstances

21   of the offense, the history and characteristics of the

22   defendant, the need to avoid unwarranted sentence disparities

23   among similarly-situated defendants, and the types of

24   sentences that are available to the Court.

25             Starting here, as the counsel have indicated -- and

1    both counsel did a good job advocating on behalf of their

2    party -- this is a statutory minimum sentence.  So the type of

3    sentence that is available is a sentence of no less than

4    120 months, or ten years.  So that's where we start out from.

5            The question then becomes where in that range would

6    the appropriate sentence lie.  And certainly, you know, the

7    Court doesn't look at this and sentence this case in a vacuum.

8    I'm cognizant of Mr. Castillo's background, of his poor family

9    life, of his age, frankly, that even though he was the adult,

10   clearly, and the victim was a child, he was still a young

11   adult, as his counsel mentioned.  And he had no criminal

12   history to speak of at that point.

13           So those things are all factors that are important to

14   note, and I do note those, and I take those into

15   consideration.  But at the end of the day, society -- our

16   society, our laws, make a special emphasis to protect

17   children.  And there's a reason for that, right?  We protect

18   kids because they can't protect themselves.  And so we hold --

19   crimes against children are held to a higher standard than

20   maybe other crimes might be between an adult and another

21   adult.  And there's no disagreement here.  Mr. Castillo knows

22   that.  He was the adult in this situation.  Minor Victim 1 was

23   a child.  And that's what makes the crime so disturbing in

24   this case.

25           But all of the factors considered, I believe that the

1   appropriate sentence here would be 180 months, followed by

2   20 years of supervised release upon release from imprisonment.

3   All of the conditions that are outlined in the presentence

4   report, the mandatory conditions, as well as the recommended

5   conditions, will be imposed.

6          Pursuant to the Sentencing Reform Act of 1984, it is

7   the judgment of this Court that the defendant, Arnold

8   Castillo, is hereby committed to the custody of the Bureau of

9   Prisons to be imprisoned for a term of 180 months on each of

10  Count 1 and Count 2.  Those sentences to be served

11  concurrently, or together.

12         This sentence covers the statutory minimum terms of

13  imprisonment.  It promotes respect for the law.  It provides

14  just punishment and affords adequate deterrence to criminal

15  conduct.  I'm not going to impose a fine, but there is the

16  restitution order.  And I'll get to that in a moment.  The

17  defendant has no future ability to pay a fine.  I'm also --

18  but I will have to impose the special assessment of $200 [sic]

19  per count of conviction.  I will not impose an assessment

20  pursuant to the Justice for Victims of Trafficking Act as

21  well.

22         The defendant will be ordered to forfeit any property

23  used to commit or to facilitate the commission of these

24  offenses and any property, real or personal, constituting or

25  derived from any proceeds obtained directly or indirectly as a

1    result of the offense.

2          The defendant shall be ordered to make restitution to

3    Minor Victim 1 in the amount of $10,000 pursuant to the amount

4    that was set out in the plea agreement.  It will be ordered

5    paid immediately.  Payment is to be made directly to the Clerk

6    of the U.S. District Court.

7          The defendant shall notify the United States Attorney

8    for this district within 30 days of any change of mailing or

9    residence address that occurs while any portion of the

10   restitution amount remains unpaid.  Any unpaid restitution

11   balance shall be paid during the term of supervised release at

12   a rate of not less than ten percent of the defendant's gross

13   monthly income.

14         Ms. Beitz?

15         MS. BEITZ:  Your Honor, I believe the Court said $200

16   per count.  I believe it's $100 per count, for a total of

17   $200.

18         THE COURT:  Yeah, maybe I misspoke.  $200 total.  100

19   per count.  Thank you, if I misspoke on that.

20         The Court finds that the defendant does not have the

21   ability to pay a fine.  I've mentioned that already, but I

22   would impose the special assessment of a total of $200.

23         Supervised release, as I indicated, is required by

24   statute.  The Court will impose a 20-year term of supervised

25   release on each of Counts 1 and 2, also to be served

1    concurrently.  And this will be served after the completion of

2    any Bureau of Prisons sentence.

3           While on supervised release, the defendant will abide

4    by the mandatory conditions that are set forth in the PSR, as

5    well as the particular conditions that are set forth in his

6    PSR as well.  I will suspend the drug testing portion of any

7    general terms based on the defendant's lack of any substance

8    abuse history here today.

9           So that is the sentence that the Court will impose,

10   180 months, Count 1 and Count 2 to be served concurrently,

11   followed by a 20-year term of supervised release.

12          Mr. Castillo, under some circumstances a defendant

13   has a right to appeal their sentence.  However, a defendant

14   may waive those rights, appeal rights, rather.  And in your

15   plea agreement that we discussed some time ago, you did have

16   an appeal waiver section in that plea agreement.

17          Such waivers are generally enforceable.  But if you

18   believe that the waiver is not valid or there is some piece of

19   the sentence or the conviction that you believe would be

20   appealable, you can speak to your counsel about that, and you

21   can present that theory to the Appellate Court.

22          Any notice of appeal, if you file one, must be filed

23   within 14 days of the entry of judgment or within 14 days of

24   the filing of any notice by the Government.  If requested, the

25   clerk will prepare and file a notice of appeal on your behalf.

1   If you can't afford to pay the cost of an appeal or for

2   appellate counsel, you have a right to apply to proceed in

3   form of pauperis and to seek the appointment of counsel.

4           Ms. Beitz, any further matters that you think that

5   need to be resolved today over here?

6           MS. BEITZ:  No, Your Honor.  Thank you.

7           THE COURT:  Ms. Preston, anything else?

8           MS. PRESTON:  No, Your Honor.  Thank you.

9           THE COURT:  All right.  We will show the defendant

10  remanded to the custody of the marshal to begin service of the

11  sentence, and Court will be adjourned.  Thank you.

12          COURTROOM DEPUTY:  All rise.

13      *(Adjourned at 3:24 p.m.)*

14              ****************************

15

16              CERTIFICATE OF COURT REPORTER

17  I, Amy L. Hooten, RMR, CRR, certify that the foregoing is a

18  correct transcript from the record of proceedings in the

19  above-entitled matter.

20

21

22  s/s Amy L. Hooten May 8, 2024

23  AMY L. HOOTEN, RMR, CRR
    Official Court Reporter
24  Southern District of Indiana
    Evansville Division

25